RUTH LICHTENSTEIN, as Administratrix of the Estate of GARY LICHTENSTEIN, Deceased, Respondent-Appellant, v MONTEFIORE HOSPITAL AND MEDICAL CENTER, Appellant, and GERALD SCHNEIDER et al., Respondents.

First Department, March 3, 1977

*Arthur N. Seiff* of counsel *(John J. Tullman,* attorney), for respondent-appellant.

*Thomas R. Newman* of counsel *(Frank Bastone, Jr.,* with him on the brief; *Bower & Gardner,* attorneys), for appellant.

SILVERMAN, J. This is an action for damages for wrongful death of Gary Lichtenstein, husband of plaintiff Ruth Lichtenstein. Plaintiff alleges that Gary's death was caused by the negligence of defendant-appellant, Montefiore Hospital and Medical Center (hereinafter "hospital"), in permitting Gary to escape ("elope") from an open psychiatric unit at the hospital, as a result of which, plaintiff alleges, Gary committed suicide a few hours later by jumping under a subway train. The jury rendered a verdict in favor of plaintiff against the hospital and against two physicians, Drs. Schneider and Penziner. The Trial Judge thereafter dismissed the complaint as against the doctors, and although plaintiff filed a notice of appeal from that dismissal, plaintiff is not pressing that appeal. The hospital appeals from the judgment against it.

As to the claim against the hospital, plaintiff does not

criticize the treatment that the doctors directed for Gary, including his being in an open psychiatric unit with the therapeutic benefit of such an open unit (and the inevitable risks incident thereto). Plaintiff does criticize the hospital's alleged negligence in carrying out the doctors' instructions, as a result of which Gary eloped. The doctors had directed that Gary's whereabouts be checked every 15 minutes to one-half hour. The psychiatric unit in which Gary was a patient at the hospital was not locked. One reason for this was the judgment of the doctors that the patients would do better in an atmosphere that was not prisonlike and in which the patients would be encouraged to assume greater responsibility for taking care of themselves. However, a nurse was constantly in attendance 10 to 15 feet from the door and it was her duty not to permit patients to leave the unit without authorization. Patients did not wear any distinctive garb but were dressed in street clothes, as of course were visitors, etc. Gary was apparently an "informal" patient within the meaning of section 31.15 of the Mental Hygiene Law, and as such was legally "free to leave such hospital at any time." *(Id.)*

At 11:30 of the morning of August 16, 1966, Gary was found to be missing from the unit. At about 4:30 P.M. that day his body was found under a subway train.

There was no evidence as to the circumstances in which Gary left the psychiatric unit in the hospital. In our view, there was thus no evidence that the hospital was negligent.

Plaintiff's position on this point appears to be that negligence may be inferred from the fact that Gary left the facility without authorization. We do not agree. At least in the case of an open psychiatric unit, the mere fact that a patient leaves secretly and without authority is not evidence of negligence on the part of the hospital. This is not a *res ipsa loquitur* case. This was an open psychiatric unit, not a maximum security prison, or a bank vault, or a closely guarded military installation. The nurse was a nurse, not a sentinel. Obviously any number of perfectly legitimate incidents could have occurred that would momentarily distract the nurse's attention—someone asking for a direction, a patient needing momentary assistance, etc.—and during that distraction, a patient dressed in street clothes like visitors etc., and intent on leaving the unit, could slip through the unlocked door without any negligence on the part of the hospital. Accordingly, we think the fact that the patient left is not evidence of negligence on the

part of the hospital. And there is no other evidence of negligence.

We think also that the form of the special interrogatory on this issue, as posed to the jury, unduly narrowed and distorted the issue. The relevant issue as to negligence was whether the hospital used reasonable care in the care of the patient pursuant to the psychiatrists' directions, the reasonableness to be judged relative to all the circumstances, including the foreseeability and severity of the actual risk of suicide in the medical judgment of the psychiatrists ("[t]he risk reasonably to be perceived defines the duty to be obeyed," *Palsgraf v Long Is. R.R. Co.*, 248 NY 339, 344 [1928]), and the desirability of permitting the patient to benefit from the therapeutic value of an open unit. Although the court discussed these factors, the formulation of the special question to the jury on the issue of negligence perhaps obscured these factors and could easily have led the jury to concentrate on the narrow question as to the adequacy of the precautions taken to prevent the patient from leaving the hospital without reference to other circumstances bearing on reasonableness. Thus the question submitted to the jury on this issue was, "Were the defendants negligent in permitting Gary Lichtenstein to leave the hospital on August 16, 1966?" This was accentuated by the court's charge to the jury that "the law says that the hospital was under a duty to use reasonable care to prevent Mr. Lichtenstein from escaping from its facility."

In our view, furthermore, the verdict was grossly excessive, being $400,000 (which with interest came to $638,000 by the time of the judgment). The statute limits damages in wrongful death cases to "fair and just compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought." (EPTL 5-4.3.) Here, decedent was 20 years old, a student in his third year in college and suffering at the time from an acute and incapacitating mental illness. He was not and never had been self-supporting. His wife, of the same age, was self-supporting. They had been married six months at the time he went into the hospital. The only other person for whose benefit the action was brought was the decedent's father, then aged 66 and retired, and to whose support decedent apparently had never contributed. In these circumstances, an appraisal of the pecuniary loss at $400,000 was much more speculative than

the usual effort to appraise the pecuniary loss in a wrongful death case, and was, we think, grossly excessive.

While dismissal of the complaint would be consistent with our view that there is no evidence of negligence, we have the discretion to order a new trial. *(Brown v Rosenbaum,* 259 App Div 304 [1940].) We think the interests of justice would be better served by ordering such a new trial. The parties will thus have a further opportunity to present evidence, if they can, as to the circumstances of Gary's leaving the hospital.

As there is to be a new trial, we set forth our views as to certain of the disputed questions in the case:

If it is shown that decedent, shortly or a few days before his death, expressed the intention to commit suicide by jumping under a train and his body was a short time later found under a train, we think the jury could infer—as indeed the doctors did—that the death was due to suicide.

On the question of proximate cause: If the danger (from the patient's leaving) foreseen and to be guarded against by the hospital was suicide and the hospital failed to use reasonable care—reasonable being determined in the light of the circumstances discussed above—to safeguard the patient against escape and suicide, and if as a result of that lack of reasonable care, the patient escaped and suffered the very harm foreseen and to be guarded against—suicide—then the jury could reasonably find that the hospital's negligence was a proximate cause of the suicide. (Cf. Restatement Torts 2d, § 449.)

We agree with the Trial Judge in his exclusion of the written report of the social worker, Miss Genetos, for the reason that the written report was not made until almost a year after the conversation reported and was thus not made within a reasonable time after the event recorded, and thus did not qualify within the business entry rule. (CPLR 4518, subd [a].) However, the conversation between the social worker and plaintiff wife was not excludable as a confidential communication under CPLR 4508 for the reasons that the plaintiff wife was not the social worker's "client" and, perhaps, in any event, the confidentiality was waived by the bringing of this lawsuit.

We also think that the notation on the hospital record made by the doctors under "Final Diagnosis," "Death by suicide after elopement from hospital," was admissible in evidence. We think that in the case of a psychiatric patient as to whom the doctors, as part of their diagnosis and treatment, had

formed a judgment as to whether and the degree to which he was suicidal, the later judgment that his death was due to suicide within hours after eloping from the hospital was related to the hospital's business of diagnosis and treatment just as much as the determination by the hospital of any other cause of death of a patient where that cause is related to, or even refutes, the diagnosis of the condition for which the patient was under treatment. Furthermore, as the entry was made by the hospital's physicians and offered in evidence by the hospital's adversaries, it was admissible as an admission.

The judgment of the Supreme Court, Bronx County (SIDNEY ROSEN, J.), entered July 23, 1976, in favor of the plaintiff against defendant-appellant Montefiore Hospital and Medical Center in the sum of $638,391.50, and dismissing the complaint against defendants Schneider and Penziner, should be modified on the law and the facts so as to reverse the judgment as against Montefiore Hospital and Medical Center, and a new trial ordered as to said defendant, and the jury's findings on the special verdict should all be vacated, and the judgment otherwise affirmed, with costs to abide the event.

The appeal from the order entered June 10, 1976, denying the motion to set aside the verdict, should be dismissed, as moot.

LANE, J. (dissenting). The plaintiff's decedent was a patient in the open psychiatric ward of Montefiore Hospital. The open ward creates an environment for the patients in which the patient is encouraged to build up self-reliance. The goal is to effectuate rehabilitation more quickly. In the Montefiore open ward, the patient and the staff all wore regular street clothing. Doors were generally kept unlocked. Patients were on occassion authorized to take outdoor walks. A nurse was stationed at the entrance to the open ward to prevent patients from leaving the building without authorization. The decedent was admitted as a voluntary patient and, according to the hospital physicians, was not actively suicidal. As part of his treatment at one time, he was allowed to take daily walks outside the hospital for one or two hours.

The decedent eloped from the hospital premises on August 16, 1966 and some six hours later his body was found underneath a subway train.

Utilization of a concept such as the open ward is geared towards rehabilitation and recovery of the patients afforded

that treatment. Certainly, prediction of the future course which mental illness may take involves professional judgment which is not without risk; however, such rehabilitative treatment should not therefore be frustrated since, on balance, the benefits to be derived outweigh the detriments *(Centeno v City of New York,* 48 AD2d 812, 813; *Kardas v State of New York,* 24 AD2d 789; *Taig v State of New York,* 19 AD2d 182, 183).

In the case at bar, therefore, the placement of the decedent in an open-ward situation based on accepted methods and the honest professional opinions of treating physicians should not be condemned or result in liability falling upon the treating physicians.

Regarding the care used in supervising the patients in the open ward, I only note that no evidence was introduced to indicate the method the decedent used to leave the hospital. Furthermore, it was not proven that increased supervision in consonance with an open-ward concept would have prevented his elopement. However, even if we accept the underlying assumption that the hospital was negligent in failing to prevent the patient from leaving the hospital, there is no proof that his leaving was the proximate cause of his death, which ingredient is a *sine qua non* for casting liability upon the hospital *(Sheehan v City of New York,* 40 NY2d 496, 501).

No evidence at all was adduced to show how the decedent ultimately ended up on the subway tracks. It is only by speculation that one could conclude that he jumped to the subway tracks, and an equally acceptable conclusion could be that he slipped or fell accidentally.

In the absence of evidence of lack of reasonable care on the part of the hospital (cf. *Hirsh v State of New York,* 8 NY2d 125, 127; *Centeno v City of New York,* 48 AD2d 812), and in the further absence of a showing of the decedent's elopement as the proximate cause of his death, the complaint should be dismissed.

Accordingly, the judgment of the Supreme Court, Bronx County, in favor of the plaintiff, entered July 23, 1976 after a jury trial, should be reversed on the law and the complaint dismissed.

MURPHY and LUPIANO, JJ., concur with SILVERMAN, J.; STEVENS, P. J., and LANE, J., dissent as to the appeal from the judgment in an opinion by LANE, J.

Judgment, Supreme Court, Bronx County, entered on July

23, 1976, modified, on the law and the facts, so as to reverse the judgment as against Montefiore Hospital and Medical Center and a new trial directed as to said defendant, and the jury's findings on the special verdict are all vacated, and the judgment is otherwise affirmed, with $60 costs and disbursements of this appeal to abide the event.

Appeal from order of said court, entered on June 10, 1976, unanimously dismissed, as moot.