In the Matter of JOANNE BENNETT, Appellant, v MARIE MAR-
ROW, Respondent.

Second Department, December 5, 1977

### APPEARANCES OF COUNSEL

*Andrew L. Levy* and *John T. Hand* for appellant.

*Jerome J. Goldstein* for respondent.

*Herbert J. Malach (Marcia Robinson Lowry* of counsel), Law Guardian.

### OPINION OF THE COURT

O'CONNOR, J.

There is here presented one of the most difficult and disturbing problems known to the law—the custody of a child. The problem is, of course, compounded when, as here, the conflict rages between the natural mother and a foster mother. The Family Court awarded custody of the child to the foster mother and, after carefully studying this meticulously compiled record, we conclude that the order should be affirmed.

It has long been held that absent grievous cause or necessity requiring displacement or intrusion by the State, the primary right and responsibility for the care and custody of a child rests with the natural parent. Modern thinking, however, recognizes that a child is a person, and not a subperson, with rights of his or her own that attain, in many circumstances, constitutional proportions. (Cf. *Goss v Lopez,* 419 US 565, 574; *Matter of Winship,* 397 US 385, 365; *Tinker v Des Moines School Dist.,* 393 US 503, 506; *Matter of Gault,* 387 US 1, 47.)

That the interests of the child in custody cases are paramount and in no way subservient to the cold legal right of a parent, is nowhere better stated than in a prior appeal in this very case. The court, in *Matter of Bennett v Jeffreys* (40 NY2d 543, 546, 549), although noting that "[t]he parent has a 'right' to rear its child, and the child has a 'right' to be reared by its parent", went on to say that "intervention by the State in the right and responsibility of a natural parent to custody of her or his child is warranted if there is first a judicial finding of surrender, abandonment, unfitness, persistent neglect, unfortunate or involuntary extended disruption of custody, or other equivalent but rare extraordinary circumstance which would drastically affect the welfare of the child. It is only on such a premise that the courts may then proceed to inquire into the best interest of the child and to order a custodial disposition on that ground."

Taking cognizance of the extraordinary circumstances of the

case, i.e., "the protracted separation of mother from child, combined with the mother's lack of an established household of her own, her unwed state, and the attachment of the child to the custodian" *(Matter of Bennett v Jeffreys, supra,* p 550), the Court of Appeals (1) reversed an order of this court, which awarded custody to the natural mother upon reversing an order of the Family Court, which had awarded custody to the foster mother (51 AD2d 544), and (2) remitted the proceeding to the Family Court for a new hearing as to the best interests of the child.

The new hearing extended over a four-week period and contains the testimony of some 26 witnesses; that record and the order entered thereon are now before us for review.

We are here concerned with an unsupervised, private placement and, hence, any analysis of the decision of the Family Court must be predicated not upon statute, but upon common-law principles.

Fortunately, the hearing was held before the same Judge who had presided at the first hearing some two years before. Predicated upon his observations and findings at the 1975 hearing, the court was in a rather unique position to completely re-examine and re-evaluate the testimony of those witnesses who had testified at both hearings. In the light of his intimate knowledge of the background and history of the case, he was able to conduct a more in-depth examination of the psychiatrists, psychologists, social workers, teachers and other witnesses called by the parties. Most importantly, the court was enabled to clearly and closely observe for a second time the conduct and deportment of the principals, namely the petitioner-appellant (the natural parent), the respondent (the foster parent) and Gina Marie (the infant involved). His comments therefore concerning the changes he found in the personality and demeanor of Gina Marie become all the more significant and persuasive in view of the fact that the child, in the intervening 15 months, had been living in the home of the petitioner, her natural mother.

The trial court, after noting that during the first hearing Gina Marie appeared to be a well-adjusted, happy child, went on to say that "the fact is that notwithstanding a period of some 15 months spent in the home of her mother, Gina Marie has not settled into the household. She does not feel comfortable there, she is not happy there. She continues unswerving in her request to be restored to the custody of Mrs. Marrow."

These surface observations, while bearing some significance, are certainly not controlling; but the court's conclusions concerning the natural mother are perhaps more revealing. The court said: "To the extent that the petitioner has responded to Gina Marie's needs to be housed, to be clothed, to be fed, she could be considered to have performed adequately as a parent. But she has not begun to respond to Gina Marie's emotional needs." At another point the court observed: "I am constrained to consider that Miss Bennett's motivation in seeking custody of Gina Marie stems from a feeling that she is her child and should reside with her. That she has feeling for Gina Marie I am certainly prepared to believe, but in view of the testimony presented during the course of these proceedings, I have serious reservations that she is capable of giving Gina Marie the emotional support so vital to her well-being."

The court then concluded: "This Court was asked to determine whether the mother is an adequate parent. As stated previously, she has provided materially for Gina Marie. That is to say, she has made available to Gina Marie what Welfare has provided in the first instance. But that is virtually all she has given Gina Marie. She had not given significantly of herself. I find that an emotional void exists between mother and daughter that shows no signs of being bridged despite the time they have resided together. This child continues to mourn the loss of her 'mother.'"

Addressing itself then to the relationship between the respondent and Gina Marie, the court gave credence to the testimony of a witness called by the Law Guardian, Dr. Sally Provence, a child psychiatrist from Yale University. Finding her to be "certainly the most impressive expert witness who appeared in this proceeding", the hearing court accepted Dr. Provence's testimony that a psychological parent-child relationship had developed between respondent and the child and the court noted that such bond "appears as strong today as when this case was first heard."

It was Dr. Provence's further testimony, in substance, that to remove the child from such a relationship would endanger the development of the child in many ways and could affect her academic success and her motivation to learn.

This testimony is all the more significant in view of the record, which discloses that in January, 1977 an intelligence test was administered to Gina Marie resulting in a score of 84, in the low-normal range, whereas in April, 1975 she had

scored 113. Despite efforts to explain away this rather disturbing pattern, it seems to be, at least to some extent, buttressed by the obvious and drastic decline in the physical, mental and emotional make-up of Gina Marie.

■ Reflection upon the totality of the testimony and careful consideration of all of the factors involved lead but to one conclusion, the order of the Family Court should be affirmed.

We note in closing that that order properly and fully protects petitioner's rights of visitation but, under the extraordinary circumstances here presented, the best interests of the child require that custody of Gina Marie be awarded to respondent.

DAMIANI, J. P., SHAPIRO and MOLLEN, JJ., concur.

Order of the Family Court, Westchester County, dated May 19, 1977, affirmed, without costs or disbursements.