In the Matter of Leon "RR"*, Alleged to be a Permanently Neglected Child, et al., Appellants. St. Lawrence County Department of Social Services, Respondent.

Third Department, January 25, 1979

* Fictitious name.

**APPEARANCES OF COUNSEL**

*A. Michael Gebo* for appellants.

*Ethan K. Phillips* (*Terrence J. Whelan* of counsel), for respondent.

**OPINION OF THE COURT**

MAHONEY, P. J.

Appellants' youngest child, Leon, Jr., was removed from his parents' custody, as were his older siblings, in a neglect proceeding, and he was placed in a foster home on February 11, 1971, at the age of 19 months. He has remained in the care of the foster parents since that date. In April of 1976 the older children were returned to the custody of their parents and petitioner was ordered to develop a plan to reintegrate Leon into his natural family. The plan so developed was based in part upon a report of Dr. Linda Rapp, a psychologist with the St. Lawrence County Community Services, who had interviewed Leon, his natural parents (appellants) and his foster parents. The plan called for initial one-hour visits every two weeks at the foster parents' home. The purpose of these visits was to assess the child's reaction with a view toward increasing the length of the visits, including visits to appellants' home and eventually overnight stays, if all went well. In addition to numerous visits at the foster home, there were several unsupervised visits away from the foster home when appellants were allowed to take Leon with them on short trips in their car, and there was one extended, six-hour visit to appellants' home on Christmas Eve, 1976. However, Leon became very upset following each visit and, accordingly, the plan was never carried through to fruition.

In May of 1976 Dr. Rapp interviewed Leon, appellants and the foster parents. She concluded that the child had established a very close attachment, in a parent-child manner, to his foster parents and had become severely detached from his natural parents. She also found, however, that appellants had retained an attachment to the child and that they were desirous of establishing a better relationship with him. Accordingly, she recommended the plan for reintegration. Nearly a year later, in March, 1977, Dr. Rapp visited appellants in their home while Leon was there. Based upon her observations, Dr. Rapp concluded that Leon continued to be detached from his natural parents, that there had been no strengthening of the parent-child bond and that, in fact, the child considered himself an integrated member of the foster family. She was of the opinion that any attempt to remove Leon from his foster parents and return him to his natural parents would result in substantial behavioral and, perhaps, emotional problems.

David Coran, a child psychologist with the St. Lawrence County Psychiatric Center, interviewed Leon, appellants and the foster parents in January, 1977. During the interview, Leon denied any affiliation with his natural family and indicated that he perceived his foster parents as his natural parents. Mr. Coran concluded that if the child were returned to his natural parents he would encounter behavioral and emotional problems in the future.

Following fact-finding and dispositional hearings on petitioner's application to extend placement of Leon, Jr., and a petition for permanent termination of parental rights, Family Court terminated appellants' parental rights and directed that preference for adoption be given to the foster parents. This appeal ensued.

■ Initially, appellants contend that the trial court erred in admitting into evidence the entire case record of the St. Lawrence County Department of Social Services. In our view, however, a majority of the entries in that record are admissible as business records pursuant to CPLR 4518 (subd [a]). Clearly, the department was under a legal duty to maintain the case record in question (Social Services Law, § 372; 18 NYCRR 470.7 [a] [1]), and, accordingly, such records constitute business records within the meaning of the statute *(Kelly v Wasserman,* 5 NY2d 425). Moreover, there is no evidence that the entries were not made within a reasonable time after the events recorded, and we, therefore, reject appellants' contention that the records are inadmissible as not contemporaneous (cf. *Toll v State of New York,* 32 AD2d 47, 50, with *Lichtenstein v Montefiore Hosp. & Med. Center,* 56 AD2d 281, 285). Of course, in order to be admissible, it must appear that the persons supplying the information were under a business duty to impart such information to the person making the entry *(Johnson v Lutz,* 253 NY 124, 128), and we conclude that the department's caseworkers and the foster parents were under such a duty. Entries which constitute admissions made by appellants to the caseworkers are also admissible (see *Kelly v Wasserman, supra; Penn v Kirsch,* 40 AD2d 814). Moreover, business entries containing statements by outsiders may be admissible to prove not the truth of the facts contained therein but that the statements were made (see *Toll v State of New York, supra).* Accordingly, a majority of the entries in the record in question are admissible pursuant to the above general principles, and as in *Matter of Bradley U* (55 AD2d

722), the trial court made it plain that objectionable material would not be considered in reaching a determination. Considering the volume and complexity of the case record, we perceive no error in the procedure followed by the trial court.

■ Turning to the merits, the statutory authority for terminating parental rights relied on by the court is contained in section 384-b of the Social Services Law, which authorizes termination of parental rights where the child is a permanently neglected child (Social Services Law, § 384-b, subd 4, par [b]). A permanently neglected child is defined as one whose parents have "failed for a period of more than one year following the date such child came into the care of an authorized agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so, notwithstanding the agency's diligent efforts to encourage and strengthen the parental relationship when such efforts will not be detrimental to the best interests of the child." (Social Services Law, § 384-b, subd 7, par [a].) It is clear from the record that appellants have not failed to maintain contact with Leon. On the contrary, the evidence establishes that appellants took every available opportunity to visit their child except when weather or car trouble interfered. The statute, however, is stated in the disjunctive and, thus, even though parents may maintain contact with their children, the failure to plan for the future of the children, in and of itself, suffices to support a determination of permanent neglect *(Matter of Orlando F.,* 40 NY2d 103; *Matter of Amos HH,* 59 AD2d 795).

■ ■ The planning required by the statute is simply the formulation of a feasible and realistic plan, and the particular *facts and totality of circumstances of each case must be* scrutinized to determine whether this requirement has been met *(Matter of Orlando F., supra,* pp 110-111). The trial court found that appellants "have shown no understanding whatsoever of this deeply troubled and emotionally upset little boy" and that, accordingly, their plans were inadequate. While the evidence on this issue is less than overwhelming, we conclude that considering the record in its entirety there is ample support for this finding despite the apparent good faith desire of appellants to have their son returned to them.

Next, appellants contend that the agency failed to make diligent efforts to encourage and strengthen the parental relationship as required by the statute. Without passing on

the adequacy of the agency's efforts, we conclude that any such failure would be excused based upon our conclusion as to the child's best interests discussed hereafter (Social Services Law, § 384-b, subd 7, par [a]).

In *Matter of Bennett v Jeffreys* (40 NY2d 543, 549), the court held that unfortunate or involuntary extended disruption of custody is an extraordinary circumstance justifying intervention by the State in the right and responsibility of natural parents to the custody of their children, and upon a finding of such an extraordinary circumstance, the court may then proceed to inquire into the best interests of the child and to order a custodial disposition on that ground. In *Matter of Sanjivini K.* (40 NY2d 1025), the Court of Appeals directed that the rationale of *Matter of Bennett v Jeffreys (supra)* be applied to proceedings to terminate parental rights. Thus, the courts have held that there exists a common-law standard for termination of parental rights independent of the statutes (see *Matter of Kim Marie J.,* 59 AD2d 716; *Matter of Suzanne Y.,* 92 Misc 2d 652).

Here, Leon, Jr., who is now nine years of age, has been continuously absent from his parents' custody since he was 19 months old. This constitutes an extraordinary circumstance justifying an inquiry as to the child's best interests for the purpose of custodial disposition *(Matter of Bennett v Jeffreys,* 40 NY2d 543, *supra).* On the best interests issue, the expert evidence, as summarized above, overwhelmingly establishes that return of custody to appellants could have a substantial detrimental impact upon Leon, Jr., and we, therefore, conclude that the Family Court was justified in finding that the child's best interests require permanent termination of appellants' parental rights. Accordingly, the order should be affirmed.

We note that, contrary to the suggestion made by the dissent, the expert testimony herein did not pertain to the relative fitness of the natural parents vis-à-vis the foster parents, but rather it was directed solely to the mental and emotional impact upon Leon of further attempts to reintegrate him into his natural family. Moreover, while we agree that inadvertent adherence to expert opinion should be avoided, the Family Court's determination herein that permanent termination of parental rights is in the child's best interests was based upon the opinion of two experts that any further attempt to remove Leon from his foster parents would

lead to substantial behavioral and emotional problems and upon other evidence, consistent with these opinions, regarding the effect on Leon of previous efforts at reintegration and the natural parents' lack of understanding of the problem. A determination with such a substantial foundation of evidence in the record should not be overturned upon the assumption that "under different circumstances" Leon would want to join his natural parents and brothers and sisters despite a separation of nearly eight years.

The order should be affirmed, without costs.

HERLIHY, J. (dissenting). The very nature of proceedings involving the disruption of the parental rights of physical custody of children has resulted in each case necessarily turning upon its own facts. While the cases of *Matter of Bennett v Jeffreys* (40 NY2d 543) and *Matter of Sanjivini K.* (40 NY2d 1025) emphasized that the existence of "extraordinary circumstances" might warrant the displacement of a parent, nevertheless, the best interests of the child prevail.

In the present case the infant has been in the physical custody of the same foster parents since the age of 19 months. The cases which must serve as precedent for an application of the considerations involved in the present case are probably exemplified by the *Bennett* and *Sanjivini K* cases together with *People ex rel. Cusano v Leone* (43 NY2d 665) and most recently *People ex rel. Ninesling v Nassau County Dept. of Social Servs.* (46 NY2d 382). In passing, it should be noted that, subsequent to the decision of the Court of Appeals in the *Bennett* case, the Appellate Division for the Second Department affirmed a Family Court order which denied custody to the natural parent *(Matter of Bennett v Marrow,* 59 AD2d 492).

In determining cases involving mental and emotional effect upon an infant who has lived with one set of parents since he was of tender age, it requires no particular expertise to recognize that an infant will be adversely affected by a transfer of custody to new parents. Regardless of social ideology and the particular conclusions of psychologists and psychiatrists as to family standards and the interaction of family members, the courts should not let the artificial concept of normality becloud the real world of familial relationships and family life in general. In particular the courts should not through inadvertent adherence to "expert" opinion give cre-

dence to the theory that any one person is "better" than another.

The general fitness of the natural parents to have the custody of their children is established by the fact that the same Family Court as herein had previously returned their other children to them. That the parents had followed the specific instructions of the caseworkers to at least a reasonable extent is not disputed. That the parents have fully cooperated with the Department of Social Services is conclusively shown. The finding of the Family Court that the parents had shown no understanding of the infant and "their plans" were inadequate is without any foundation at all. In the first place, they had completely co-operated with the caseworker as to a plan and there can be no doubt that the plan was adequate since the Family Court has praised it. In the second place, the caseworker's notes which were put in evidence show that on January 14, 1976 the natural mother was complaining about the foster parents not encouraging the parental relationship and, further, the caseworker noted on June 2, 1976: "[Natural parents] left the conference with the understanding that they would have to cooperate fully with the Department of Social Services or else * * * they would not get Leon back." Finally, on the question of the parents' recognition of the emotional problem for the boy, the caseworker noted on December 29, 1976 that the parents agreed to a psychological re-evaluation in order to cope better with the boy. A Doctor Rapp testified that the natural parents advised her at an interview on May 5, 1976 that they believed they had not had sufficient time to integrate the boy in their family.

Before proceeding further, it should be noted that the natural parents objected to the introduction in evidence of the entire case record of the administrative agency. Their objection has great merit in view of the momentous consequences which could flow from reliance on that record as evidence. The better procedure would seem to be to exclude it as a general offer of evidence.

However, in the present case the notes of the caseworkers, as contained in the case record, require a rejection of any finding which would premise the permanent termination of parental rights upon the attachment of the infant to his foster parents.

The infant was placed with the foster parents on February

11, 1971. As early as December 20, 1973 the caseworker, Welch, noted that the foster parents were "running down" the natural parents and that the boy did not want anything to do with the parents. As early as March 11, 1974 the caseworker noted that "any rehabilitation of this family * * * not of much use". The following notes generally classified by dates seem relevant (these are not quoted verbatim):

March 12, 1974, the caseworker told the foster parents that she was "glad" that the boy considered them as his parents.

January 8, 1975, the caseworker notes that he had spent all of his time since the court hearing of 1973 trying to get together proof that the natural parents were guilty of permanent neglect.

September 10, 1974, the caseworker again recognizes that the boy considers the foster parents as his real parents and states he wants to keep him with foster parents as long as possible.

April 24, 1975, natural parents told caseworker that they would not surrender their children.

May 22, 1975, the County Attorney told caseworker that they could not file for permanent neglect as requested by foster parents because they had entered into a stipulated disposition on April 24, 1975.

December, 1975, the caseworker told natural parents that he would not let them have Christmas visitation and they agreed *because* they did not want to upset the boy.

December 16, 1975, the caseworker suggested to the foster parents that *they* file for neglect with the department "backing them".

January 14, 1976, the natural parents told caseworker that they will not surrender the infant.

January 15, 1976, the foster parents objected to fact that once a month all of the infant's brothers and sisters would be coming to visit and so stated: "Caseworker explained to [foster parents] that if they decided to file permanent neglect it would not look good if they denied the [natural parents] from bringing all the children to see him."

April 1, 1976, the Judge of Family Court at a private meeting said that he didn't see any basis for permanent neglect.

April 13, 1976, a hearing was held and: "The Judge stated

that the [foster parents] had no ground for filing a permanent neglect and that they should wait until a later date."

July 12, 1976, the caseworker reported that Leon, Jr. "did not give out any overt signs that he was upset * * * did not put up any sort of fuss."

The record establishes that, throughout the period from February 11, 1971 to the time of the hearing, the natural parents were permitted to visit the infant only every other week and, except for the period commencing on July 12, 1976, all of these visits were limited to one hour at the home of the foster parents. The natural parents dutifully exercised their right of visitation, but as the foregoing consideration of the notes indicates, the administrative agency was at all times encouraging the attachment of the infant to his foster parents and was not making any attempt to assist the natural parents to at least have an equal attachment. Furthermore, there is not doubt that the agency was knowingly encouraging the foster parents to consider adoption and was undermining the natural parental relationship. The role of the foster parents in this case was that of adoptive parents and yet, such a placement was precisely the opposite of foster care as it is described in the case of *People ex rel. Ninesling v Nassau County Dept. of Social Servs.* (46 NY2d 382, *supra*). While one would not dispute the conclusion that the Department of Social Services and the Family Court were sincere in encouraging the foster parents that at some future time they would find permanent neglect as to the natural parents, such methods are inconsistent with any theory of temporary placement.

It is quite apparent that in regard to this infant there had been no exhibition of any diligent effort on the part of the agency to encourage and strengthen the parental relationship prior to April 13, 1976. On April 13, 1976 the Family Court directed that two more of the infant's siblings be returned home and in May of 1976 a Doctor Rapp recommended that a plan be prepared for the gradual reintegration of the boy with his parents. It appears that the Department of Social Services did prepare such a plan; however, it was made conditional upon the family relationship with the rest of their children and any visitation would be "entirely dependent on the effect on Leon's emotional and social developments." The plan still limited visitation to once every other week commencing with one hour. However, the boy was to visit home overnight and for a weekend.

As it turned out, the caseworker decided that actually the visitation under the plan which did not even commence until July 12, 1976 was too hard on the infant and so there never were any overnight or weekend visits. The notes and testimony in this record indicate that on July 26, 1976 he told the boy that he did not have to go outside of the foster home with natural parents and so he did not go on that date. The notes indicate that on September 9, 1976 the worker said that the infant would have to go for a ride with natural parents *on* October 2, 1976 and he apparently went then and also on October 16, 1976. As of October 22, 1976, the school had not reported any harmful effect on the boy from visitation.

On November 12, 1976 the boy went to his natural parents' home for a visit in the presence of the caseworker. The boy did not want to leave the caseworker and did not seem to enjoy the visit at all. The boy also visited at his home on December 24 or December 25, 1976 and was there for several hours without any monitor. Although the natural parents report the boy as having had a good time, the foster parents report the boy said he did not like it and did not want to return and he tells the caseworker the same thing. Thereafter, the boy did not go out of the foster home for any visits and there was no attempt made to encourage the familial relationship except the natural parents would visit at the foster home every other week until a visit of February 24, 1977.

The caseworker suggested to the natural parents that a re-evaluation be made at the mental clinic and the parents agreed, believing it to be a tool useful in coping with the situation. However, the clinic recommended permanent termination of their parental rights on February 4, 1977 and the County Attorney on February 7, 1977 reported to the caseworker that there were "grounds" for permanent neglect. Nevertheless, the caseworker arranged another house visit with the parents for February 24, 1977 to be "monitored" by Dr. Rapp being present in the home. Dr. Rapp concluded that the boy had no affection for his parents and so reported to the court with a recommendation that parental rights be terminated.

A Mr. Coran who participated in the re-evaluation of the boy in January or February of 1977 testified that his report in regard to the emotional attachment and/or reaction of the boy with his parents would have been better if he had four or five

interviews instead of the one interview lasting about one-half to three-fourths of an hour.

Dr. Rapp testified that she had no knowledge of how many visits there were between the boy and his natural parents, but because he had no attachment to them and would suffer trauma by being removed from the foster parents, "[i]t would be in his best interests not to be removed from foster home".

The present record as a whole establishes a particular situation wherein the Department of Social Services from the outset had considered that there should be a permanent termination of parental rights as to the infant. The conduct of this placement is an abuse of a system that does not contemplate adoptive placement until the child is free for adoption. These parents have never had any meaningful opportunity to secure the affection of their son, assuming that loss of affection could cause a termination of parental rights *(Matter of Bennett v Marrow,* 59 AD2d 492, *supra).* Indeed, when finally forced to have a plan for the reintegration of the boy with his parents, the administrative agency does not even carry it out, but instead tells the infant that the Family Court is making him have visits and generally there is nothing to assist the parents.

In *Matter of Bennett v Marrow (supra)* there is evidence that the infant had been forced to reside with the natural parents for a period of 15 months and that there were at least some identifiable adverse reactions. While I have no doubt of the power of the courts to act swiftly and certainly to prevent any grave injury to the children of this State, I see no such situation here. It is difficult to conclude that the little boy, under different circumstances, would not want to join his natural parents and brothers and sisters. The parents herein have had no opportunity to act as parents and the limited visitation permitted by the Department of Social Services, together with the hostility of the foster parents, cannot be so easily rewarded with the termination of parental rights.

This proceeding was instituted by the St. Lawrence County Department of Social Services and the petition is general and conclusory. The foster father did not testify and his wife only stated that they would be willing to provide a permanent home for Leon, Jr.

The present record is entirely inadequate to supply facts supporting a decision by the expert witnesses or the courts that a transfer of custody would in truth have an adverse

effect upon the boy of any duration or great depth. I reiterate that section 611 of the Family Court Act "is extremely harsh and seems contrary to human interests and should only be implemented under the most stringent circumstances." Here, the natural parents want there child and there is no showing in this record to deny them such right (see *Matter of Anita "PP"*, 65 AD2d 18).

The order appealed from should be reversed and the petition for permanent termination of parental rights dismissed, and the matter remitted for consideration of the petition for a continuance of custody.

KANE, STALEY, JR., and MAIN, JJ., concur with MAHONEY, P. J.; HERLIHY, J., dissents and votes to reverse in an opinion.

Order affirmed, without costs.