OPINION OF THE COURT
Karen I. Lupuloff, J.
Introduction
Erica A. is the mother of Nicholas A. Nicholas, now age seven, has been the subject of child protective proceedings since he was 10 weeks old. Nicholas is currently placed in foster care as a result of the most recent order of disposition issued by this court against his mother, the respondent.
Respondent mother Erica has volunteered to participate in an instructional film being produced by her attorneys and has consented to the filming and participation of Nicholas as well. The Legal Aid Society, representing Nicholas and the Administration for Children’s Services (hereinafter ACS) oppose such filming and have asked this court to find that the use and dissemination of Nicholas’ image and identity is against his best interests and should be prohibited. For the reasons that follow, the court will conduct a hearing to determine whether Erica’s consent to the filming of her son should stand or whether her consent must be overridden.
Procedural History
The respondent mother Erica was first brought before Bronx County Family Court after ACS filed a child neglect petition in *641 October 2004, naming Nicholas as the subject child. Nicholas was a 10-week-old infant at the time of the filing. In June 2005, the then-presiding judge awarded Erica an adjournment in contemplation of dismissal (hereinafter ACD) pursuant to Family Court Act § 1039. Erica successfully completed the requirements of the ACD and the case was dismissed by operation of law in May 2006.
The current neglect petition was filed against Erica on October 3, 2008. In this case, Erica was charged with having neglected Nicholas, then four years old, by abusing marijuana while her son was in her care and not regularly participating in a drug treatment program. The petition further alleged that Erica, who was residing with Nicholas in a group home for teenage mothers, frequently left the program without permission for days at a time, sometimes leaving Nicholas with no provisions and other times taking him with her. In addition, the petition alleged that Erica sometimes left Nicholas in the care of her mother who also had a history with ACS and who, according to the petition, admitted having abused crack cocaine in August 2008. Finally, the petition alleged that Erica told ACS that she wanted to place Nicholas in foster care because she could not care for him.
Nicholas was remanded to foster care on October 3, 2008. The presiding judge found that it was contrary to Nicholas’ welfare to parole him to Erica’s care and that to do so would place Nicholas in imminent risk to his life or health. The judge further found that there were no actions ACS could have taken at the time to avoid the need of removal in that Erica articulated her desire to place her son in foster care because she could not properly care for him.
Nicholas remained in foster care for several months while Erica entered a residential drug treatment program. The case was transferred to the undersigned and was first heard by this court on September 16, 2009. On that date, the court learned that Erica was fully compliant with her program and had been drug and alcohol free for upwards of 10 months. The court indicated that, upon the consent of all counsel, and upon Erica’s continued compliance, it would award Erica her second ACD.
On February 3, 2010, the court granted a parole of Nicholas to Erica conditioned on her complying with ACS supervision and residing with her son in a parent-child residential program. The matter was next before the court on February 22, 2010. On consent of all parties, the undersigned awarded Erica an ACD *642 for a period of 12 months. The conditions of the ACD required Erica to reside with Nicholas in the parent-child program until she completed it, to remain compliant with an aftercare/drug relapse prevention program, and to comply with ACS supervision and reasonable referrals.
On August 17, 2010, ACS filed a petition charging Erica with violating the terms and conditions of the ACD. Specifically, ACS charged that Erica repeatedly left the parent-child program overnight without permission and without informing the program of her whereabouts. The petition further alleged that on those occasions, Erica left Nicholas there, making the program responsible for his well-being. In addition, the petition alleged that Erica repeatedly violated the program’s curfew. She was further accused of failing to administer Nicholas’ medication, not taking him to play and family therapy, not attending her own therapy, and not complying with her relapse prevention program. This court ruled that it was contrary to the child’s welfare to continue a parole to his mother and that to do so would place him in imminent risk to his life or health. Nicholas was remanded and placed in foster care for the second time in this case.
Supervision of Erica under the ACD was temporarily extended over the next several court dates. A permanency hearing, required for children residing in foster care pursuant to Family Court Act § 1089, was conducted on February 3, 2011. The permanency goal of returning Nicholas to the respondent mother, Erica, was approved. Nicholas remained in foster care.
On August 17, 2011, Erica made an admission to the violation of the terms and conditions of the ACD. The respondent admitted that she left the parent-child program on numerous occasions overnight, that she violated curfew, that she made no plans for her son’s care and left no provisions, that she did not tell the program staff where she was going, that she stopped attending individual therapy and that she stopped attending her drug relapse prevention program. The underlying neglect charges were then restored to the calendar pursuant to Family Court Act § 1039 (e). Upon the restoration of the charges, Erica made a partial admission on consent of all counsel and in full satisfaction of the 2008 neglect petition. She admitted to having neglected Nicholas and failing to provide him with a minimum degree of supervision and guardianship by abusing marijuana while not being compliant with drug treatment, and by frequently absconding from a parent-child residential program *643 in the fall of 2008. This included one occasion in which she absconded for 11 days, leaving Nicholas there with no provisions and in which she provided no contact information as to her whereabouts.
At the next permanency hearing, conducted August 22, 2011, the goal of returning Nicholas to his mother was once again ordered but this time, ACS was also ordered to plan concurrently for Nicholas’ adoption. It was noted at the permanency hearing that Erica was just 20 years old and herself a child residing in foster care. Nicholas remained in foster care while Erica continued to work towards their reunification.
At a court session on October 13, 2011, ACS asserted that the only barrier to reunification was Erica’s need for stable housing and income. Over time, visitation between Erica and Nicholas had been expanded by the court from agency visits, to visits supervised by approved friends and relatives, to unsupervised visits. On October 13th, the court approved overnight visits to begin.
The disposition resulting from the finding of neglect was entered on November 18, 2011. Pursuant to Family Court Act § 1052, Nicholas was placed in the custody of ACS to remain in foster care. Erica was required to participate in family therapy with Nicholas, complete a parenting skills course for children with special needs, and comply with ACS supervision and reasonable referrals. The court granted leave to ACS, without having to return to court, to begin a trial discharge pursuant to Family Court Act § 1089 (d) (2) (viii) (C), meaning that Nicholas, while still residing in foster care, could be released to Erica on a trial basis.
The next permanency hearing was conducted February 16, 2012. A permanency goal of returning Nicholas to Erica was again approved. No concurrent plan of adoption was ordered. Nicholas continued to reside in foster care.
On February 29, 2012, ACS filed an order to show cause seeking to modify the order of disposition and limit respondent’s visitation due to her alleged failure to visit consistently with Nicholas. The application was heard on March 14, 2012. The court continued its order of overnight visitation and strongly urged Erica to attend each and every visit, to ensure that at weekend visits she was up early in the morning to make breakfast for her son, and to ensure that there was always enough food in the home. Further, the court prohibited Erica from leaving Nicholas alone, not even for a moment. On consent, ACS’s order to show cause was held in abeyance.
*644 The Bronx Defenders’ Request to Film the Proceedings
Evenfall, LLC, a documentary film company hired by the Bronx Defenders, wrote to the Clerk of Bronx County Family Court on March 30, 2012, seeking permission to film the May 1, 2012 court session scheduled in the instant case. In the letter, written by Evenfall’s president, Eve Morgenstern, she states that her company was hired by the Bronx Defenders to “make a short video for them about how they practice criminal defense. This is a promotional/educational/training video for their use and will not be aired on television or in movie theaters.” Attached to her letter was a one-page biography of the film makers. Also attached was a one-page summary of the film and the work of the Bronx Defenders that it sought to exhibit:
“Set in the poorest urban congressional district in the United States, The Bronx Defenders is a unique public defender office committed to helping the indigent and disenfranchised. The Bronx Defenders, through their innovative holistic defense model, achieves an 87% acquittal rate, remarkable in the South Bronx where the odds are greatly stacked against their clients . . . The film will follow The Bronx Defenders from the moment they take on a case through their entire process of defense, advocacy, and counsel as they gain justice for their clients and help them rebuild their lives. We will closely follow the dramatic stories of lawyers defending their clients against charges that threaten to separate families and destabilize lives forever. Moving and educational, this film will offer an in-depth portrait of the groundbreaking work of The Bronx Defenders and multi-layered portraits of the people they defend . . . We will be there to document the lawyers at court, fighting for their clients all the way through to conclusion. We will also follow The Bronx Defenders as they spread their model of holistic defense across the country. With the launch of The Center for Holistic Defense, three public defender offices in three states were selected to receive hands-on-training over the course of six months. At a time when the Obama administration has taken a particular interest in finding innovative ways to insure that the poor receive fair representation, this film will illuminate this successful defense model and inspire other public defender offices to follow suit.”
*645 Rules of the Chief Administrator of the Courts (22 NYCRR) part 131, entitled “Audio-Visual Coverage of Judicial Proceedings,” addresses the procedures to be followed in seeking to record court sessions. Section 131.1, entitled “Purpose; general provisions,” states in part:
“(a) These rules are promulgated to comport with the legislative finding that an enhanced public understanding of the judicial system is important in maintaining a high level of public confidence in the Judiciary, and with the legislative concern that cameras in the courts be compatible with the fair administration of justice.”
The Rules of the Chief Administrator of the Courts require that any application for audio-visual coverage of court proceedings be made to the presiding trial judge in writing. (22 NYCRR 131.3 [b] [1].) Evenfall’s written application was forwarded to the undersigned on April 10, 2012. As required by the rule, the court notified all parties of the application and calendared the matter to be heard on April 11, 2012. The matter was again heard on April 26th and 30th.
In determining the Bronx Defender’s application, section 131.4, entitled “Determination of the application,” instructs the presiding judge to conduct inquiry and review. Where the proceedings involve a child, a prospective witness or a party, and there is an objection to such video coverage, the court may hold conferences or conduct any direct inquiry, as needed. (22 NYCRR 131.4.)
During the April court sessions, the Bronx Defenders clarified the purpose of the video application and the origins of the video project. According to Erica’s attorneys, the Bronx Defenders received a grant from the United States Department of Justice to be used, in part, to train public defender offices throughout the nation about their model of holistic defense. The Bronx Defenders described the holistic defense model as a protocol in which they assist clients with criminal, family, housing and other matters through legal representation, social work involvement and parent advocacy, always addressing the relationship between all of these areas in a client’s life.
While neither Nicholas’ Legal Aid attorneys nor ACS objected to a training video conceptually, concerns were voiced about the publication of the child’s name, as well as the names of caseworkers and foster parents, and how such publication would affect the privacy and safety of those individuals.
*646 In addition to reviewing the Rules of the Chief Administrator of the Courts, the court also reviewed Civil Rights Law § 52, entitled “Televising, broadcasting or taking motion pictures of certain proceedings prohibited,” which states in pertinent part that
“[n]o person, firm, association or corporation shall televise, broadcast, take motion pictures or arrange for the televising, broadcasting, or taking of motion pictures within this state of proceedings, in which the testimony of witnesses by subpoena or other compulsory process is or may be taken, conducted by a court, commission, committee, administrative agency or other tribunal in this state . . .
“Any violation of this section shall be a misdemean- or.” (Civil Rights Law § 52.)
All counsel understood and concurred that the May 1, 2012 court appearance was scheduled for the purposes of reviewing Erica’s compliance with the court’s visitation order, determining whether a modification of disposition hearing needed to be scheduled, and to see if a trial discharge had begun or what barriers to such discharge existed. Counsel recognized that no witnesses would be testifying under oath and that no actual hearing would occur. It was also clear that caseworkers and others could be required to address the court during such session, and that, as is customary in Family Court practice, caseworkers, parties and others involved with the case would be administered an oath and asked to identify themselves on the record. Nevertheless, as no compelled testimony would be provided during the status appearance, the court concluded that this provision of the Civil Rights Law did not prohibit the filming of the session. (See Civil Rights Law § 52.)
After a thorough review and colloquy with counsel, the undersigned crafted an order permitting the filming in a way that balanced the privacy and security concerns expressed with the potential benefit of filming the proceedings for training purposes. As required by the Rules of the Chief Administrator of the Courts (22 NYCRR) § 131.4, in making its determination, the court considered and gave great weight to the fact that a child was a party to the proceeding.
The court permitted Evenfall to film or photograph the May 1, 2012 court session under the following conditions: First, that no facially identifiable photographs or videotape of the child could be taken or used in any way; second, that any mention of the names of the child, caseworkers, attorneys or members of *647 the attorneys’ staffs be redacted; and third, that no filming of any written order of the court or any writing containing a caption of the case was permitted. The court ruled that no harm would be caused by the video or photographic coverage, that the fair administration of justice and the rights of the parties would not be interfered with by the coverage, that the video or photographic coverage would not interfere with any law enforcement activity, that the proceedings would not involve lewd or scandalous matters, that the coverage was not barred by law and that the coverage would not cause a disturbance in the courtroom. The court concluded its written order with a statement that any violation would be subject to punishment by contempt.
In this court’s estimation, Evenfall filmed the May 1, 2012 court session flawlessly. Two videographers filmed, unobtrusively moving around the courtroom. They did not disrupt the proceedings nor did they insert themselves into the proceedings. The videographers were respectful and silent.
At the May 1st session, ACS deemed its order to show cause seeking to change visitation and modify the November 18, 2011 disposition order satisfied, asserting that it no longer sought to modify the disposition. On consent, the temporary order of visitation for Erica and Nicholas permitting weekend overnight visits was extended and modified to permit
“[e]very Saturday 10:00 am to Sunday 6:00 pm unsupervised overnights PLUS 1 time per month Agency supervised visitation and if the respondent mother misses three (3) visits, ACS has discretion to modify visits to 2 times per month unsupervised weekend visits; and the respondent mother is to confirm each visit 24 hours in advance; and if the respondent mother is unable to visit with the subject child for a full weekend, then the respondent is to visit with the child during the day on Saturday and during the day on Sunday, every weekend.”
The court also continued its order granting ACS leave to begin a trial discharge before the next court date. The court addressed with Erica the importance of consistent visitation and ordered her to fully comply. The court also addressed the need for stable housing for Erica and ACS reiterated that it would continue to work with her to obtain it. The court urged Erica to remain consistent and compliant with its orders and urged ACS to continue working diligently with Erica towards a reunification with Nicholas. This jurist expressed the hope that the trial discharge would have occurred by the next court date.
*648 The Discovery That Evenfall Had Already Filmed Nicholas at a Visit
During the court’s session with counsel on April 26, 2012, the Bronx Defenders disclosed its discovery that Evenfall had already filmed several hours of Erica’s interaction with Nicholas during weekend visitation. The Bronx Defenders, ACS and the Legal Aid Society did not know Nicholas was filmed until the possibility was raised by ACS in the midst of reviewing the application to film in court. This had prompted an investigation by the Bronx Defenders who then confirmed that Evenfall, with Erica’s consent, had filmed her and Nicholas during court-ordered unsupervised visitation. The Bronx Defenders stated that they were unaware of Evenfall’s actions and recognized that a better course would have been for the contractor to ask about filming Nicholas first. Had they been aware of Evenfall’s actions, the Bronx Defenders stated they would have alerted fellow counsel, recognizing that Nicholas was a child in foster care and a child represented by an attorney.
Article 10 of the Family Court Act, entitled “Child Protective Proceedings,” begins with section 1011. Entitled simply “Purpose,” it provides a general description about the article:
“This article is designed to establish procedures to help protect children from injury or mistreatment and to help safeguard their physical, mental, and emotional well-being. It is designed to provide a due process of law for determining when the state, through its family court, may intervene against the wishes of a parent on behalf of a child so that his needs are properly met.” (Family Ct Act § 1011.)
With this overarching framework in mind, the court posited several questions to counsel upon learning that Nicholas had been filmed: First, whether, and to what extent, such filming violated Nicholas’ right to privacy; second, whether the filming by the Bronx Defenders’ agent of a seven-year-old, represented child violated the attorney-client relationship; third, whether, because Nicholas was in foster care, the court and counsel should have been notified so that the court could exercise its authority regarding visitation; fourth, what protections needed to be put in place to protect Nicholas’ image from being distributed on social media or other Internet sites; and fifth, whether filming a child in foster care could be potentially psychologically harmful to him in the future.
On this last point, the court pondered whether filming Nicholas with his mother at a visit could adversely affect him later in *649 his life. The court indicated that it did not want Nicholas to become the “face” of a child in foster care. The undersigned raised concerns that when Nicholas is older, having been in a film depicting his time in foster care and depicting visitation with his mother could be embarrassing or even hurtful. In the same way that judicial opinions protect the identity of children by not publishing their full names, and in the same way that in the instant case the court prohibited the use of Nicholas’ image and name in the videotaped court session, here the court must determine what steps are necessary to protect Nicholas’ privacy from being invaded by the training video.
The court ordered the Bronx Defenders to distribute the film to all counsel for their review and prohibited any further filming of Nicholas absent specific permission from the court. Further, the undersigned prohibited the dissemination of the video absent further court order.
During the April 30, 2012 court session, the Bronx Defenders confirmed that they had distributed the video to fellow counsel. According to ACS, in excess of 60 minutes of the video contained the image of Nicholas and his identification by name. ACS and the Legal Aid Society opposed the use of Nicholas’ image and name in this portion of the training video while the Bronx Defenders supported it. The Bronx Defenders urged the court to review the video and described the interaction between Erica and Nicholas, captured during the visitation, to be appropriate and “sweet.”
ACS articulated its clear understanding that a parent does not lose all decision-making authority regarding her child merely because that child is in foster care. ACS opined, however, that there are instances in which, after a hearing, a court can grant an application to override a parent’s consent, or refusal to consent, to an action regarding a child in foster care. ACS and the Legal Aid Society each asked the court to hold such a hearing on their respective clients’ behalf.
Ordering a Best Interests Hearing — the Court’s Parens Patriae Function
A dearth of case law exists to assist the court on the narrow issue of whether a child in foster care can appear in a film about his child protective case if his parent consents, or whether, in an exercise of parens patriae, the court should block his appearance if the film is not in the child’s best interests. The court, unable to find any cases directly on point, turned for guidance *650 to other areas of the law regarding the interplay between the rights of parents to make decisions about their children and the rights of the children.
The term “parens patriae” literally means parent of the country. It refers to the role of the state as the sovereign and guardian of individuals under a legal disability, such as children or the incompetent. In child custody matters, parens patriae is the principle that the state must care for and protect the interests of the child. It is also the principle that the state must care for those who cannot care for themselves, such as children who lack proper care and supervision from their parents. (Black’s Law Dictionary 1114 [6th ed 1990].)
The few New York cases regarding the circumstances in which a judge can override a parent’s decision-making authority about their child in foster care concern the administration of medication to a child over a parent’s objection. While the instant case is factually distinct, the reasoning and language of the medical override opinions is analogous to this jurist’s reasoning in ordering a best interests hearing.
Matter of Martin F. (13 Misc 3d 659 [Fam Ct, Monroe County 2006]) is one such case addressing the parens patriae function of a family court. The Martin case concerned whether a parent’s decision to refuse the administration of an antipsychotic drug to her three-year-old daughter in foster care could be overridden by the local department of social services. The Martin court relied on Santosky v Kramer (455 US 745 [1982]), a seminal case applying doctrines of due process to termination of parental rights cases in New York, in which the United States Supreme Court ruled that “[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State.” (Id. at 753.)
The judge in Martin reasoned that
“[o]f course, a three-year-old child by definition is incompetent to make his or her own medical decisions, and even though a parent has lost the care and custody of his or her children due to neglect, he or she still retains his or her constitutional right (i.e., liberty interest) to the management of important medical decisions for those children. The parental competence of Desiree’s mother is not an issue here, as it must be concluded that the parens *651 patriae power of the State would always exist with respect to young children in the State’s care, as they would always be deemed incompetent to make their own medical decisions. In cases where a parent objects, the decisive question must be whether the medication should be administered to the child under the parens patriae power.” (Martin at 677.)
The Martin court concluded that, had the local department of social services originally sought a court order for the authority to administer the medication to the child over the mother’s objection, the court would have conducted a hearing in which it would have weighed the evidence, determined the merits of the mother’s objection and considered the government’s parens patriae interest in its request to override the mother’s refusal.
In a similar vein, the Appellate Division, Second Department, in the case of Matter of Justin R. (63 AD3d 1163 [2d Dept 2009]) upheld an order of a family court in a child protective proceeding in which, after a hearing, the court granted the petitioner’s application to administer psychotropic medication to a child in foster care, over the parent’s objection. The Appellate Division held that
“[t]he Family Court properly determined, following a hearing to which the subject child and his parents were parties and all were represented by counsel, that the petitioner demonstrated, by clear and convincing evidence, that the proposed treatment of the subject child with the psychotropic drug risperdal was ‘narrowly tailored to give substantive effect to the [child’s] liberty interest, taking into consideration all relevant circumstances, including the [child’s] best interests, the benefits to be gained from the treatment, the adverse side effects associated with the treatment and any less intrusive alternative treatments’ (Rivers v Katz, 67 NY2d 485, 497-498 [1986]; see Mental Hygiene Law § 33.21; cf. Matter of Sombrotto v Christiana W., 50 AD3d 63 [2008]; Matter of Martin E, 13 Misc 3d 659 [2006]).” (Justin at 1163-1164.)
The question of what is in a child’s best interests is not, of course, limited to the area of child protection. Indeed, in child custody matters, the determination by the court as to the best interests of a child is paramount. And, while the instant case is not about the custody of Nicholas, language from Matter of Bennett v Marrow (59 AD2d 492 [2d Dept 1977]), a seminal New *652 York custody case regarding the best interests of a child, is analogous to the undersigned’s reasoning in ordering a best interests hearing.
In Bennett, the Appellate Division upheld a finding that extraordinary circumstances existed to warrant an order of custody of a child to a non-parent based on the best interests of the child. The Bennett Court reasoned that
“[i]t has long been held that absent grievous cause or necessity requiring displacement or intrusion by the State, the primary right and responsibility for the care and custody of a child rests with the natural parent. Modern thinking, however, recognizes that a child is a person, and not a subperson, with rights of his or her own that attain, in many circumstances, constitutional proportions. (Cf. Goss v Lopez, 419 U.S. 565, 574; Matter of Winship, 397 U.S. 385, 365; Tinker v Des Moines School Dish, 393 U.S. 503, 506; Matter of Gault, 387 U.S. 1, 47.) . . .
“[T]he interests of the child in custody cases are paramount and in no way subservient to the cold legal right of a parent.” (.Bennett at 493.)
The above cases, while factually distinct from the issue before this court, all demonstrate that when the rights and wishes of parent, child and government are at odds regarding a matter of significant import such as forced medication or custody, that the interested parties are entitled to a full evidentiary hearing. In the case at hand, due to the competing interests of Erica, a parent with the authority to make decisions regarding her child, ACS, the agency responsible for the supervision and guardianship of Nicholas while in foster care, and Nicholas, a child represented by counsel who enjoys individual rights, an evidentiary hearing is warranted. At such hearing, this jurist will determine whether it is in Nicholas’ best interests to permit his appearance in the film or whether his best interests require the court to override Erica’s consent.
The court draws no negative inference against Erica for her decision to permit Nicholas to appear in the film. The court further declares that whatever its ruling about the use of Nicholas’ image and name in the training video, such ruling will have no impact on the court’s determination regarding visitation, permanency or other matters directly related to the neglect proceeding. The hearing is scheduled for July 17, 2012 and September 21, 2012.