Cooke, J.
This is a proceeding pursuant to article 6 of the Family Court Act (§§ 611-634, inclusive) instituted by the New York Foundling Hospital to permanently terminate respondent Theodora’s parental right to the custody of her son. The crucial issues involve the planning by the mother for the future of her child and the permission given by the Family Court to the child’s Law Guardian to withdraw at the beginning of the fact-finding hearing, without any replacement.
The Family Court dismissed the petition which sought a declaration of permanent neglect and, further, ordered the return of the child to his natural mother. The Appellate Division modified that order by striking the provision directing the return of the child and otherwise affirmed.
On June 27, 1971, Theodora gave birth to a boy, Orlando, the subject of this proceeding. The father of the youngster is unknown. Respondent, then 18 years of age, had spent 10 of her years at a State institution for the retarded, but had been released about a year prior to Orlando’s birth. She was classified in her last IQ test as "dull normal”. When only three days old, the Bureau of Child Welfare obtained an emergency placement for Orlando and in July, 1971, he was placed with a foster family in Rockland County, in whose care he has remained since then. During the first year of Orlando’s stay with his foster parents, respondent initially returned to her own foster home, later living with her father and then with her mother, but during the summer of 1972 she went to stay with some friends, Linda and Richard Dennis and their small child. During that first year, the respondent visited her son on three occasions, in August of 1971 and then in January and April of 1972. There was evidence that until the fall of 1972 petitioner had assigned no caseworker to assist respondent mother, although help was received from a Ms. Peterson, an employee of the State Department of Mental Hygiene.
*107 At the fact-finding hearing before the Family Court, a social worker for petitioner, David Pilliod, testified that he was assigned to the case in September, 1972 and that, after contacting respondent who had not dealt with the agency since the prior January, a meeting was scheduled for October 12, 1972. At that conference, attended by Pilliod, Peterson and respondent, it was agreed that there would be an intensive drive in weekly sessions for the next six months in an effort to strengthen the parent-child relationship. Pilliod stated that a plan should be devised which "would start by considering visits and also by reflecting on what her plans were for herself and the baby.” Respondent informed the witness that she was looking for an apartment.
An appointment, set for October 16, 1972, was not kept by respondent. Pilliod attempted, without success, to contact her through Ms. Peterson and a Mrs. O’Shawnessy, a worker at the Handicapped Rehabilitation Center where respondent was being trained to procure employment. Theodora called on October 30, 1972 and met with Pilliod on November 3, 1972, after arriving two hours late. Plans to have the mother visit with her son on December 27, 1972 were initiated and on November 10, 1972 details for the visit were discussed. Appointments for November 17 and 19, 1972 were broken because respondent had overslept and, again, on December 15 because she had forgotten about it. A visit did, however, take place on December 27, 1972, but Orlando began to scream as soon as he was brought into the room. Attempts to calm the child proved futile and he started to kick and scream whenever his mother came near him. After Orlando’s return to his foster parents, respondent, who appeared quite upset, told Pilliod that she was moving into an apartment on January 1, 1973. At a meeting on January 5, 1973, it was disclosed that respondent had not as yet moved into her apartment due to a lack of furniture and that she refused Pilliod’s offer to consult welfare. Appointments scheduled for January 15 and 16, 1973 were not kept, so that another was slated for January 22, 1973, to prepare for a visit with Orlando two days later. This meeting had to be postponed because respondent mistook the date and came on the 25th of January rather than the 24th. When she subsequently failed to appear for sessions set for February 6 and 8 and March 5 and 12, 1973, Pilliod phoned the rehabilitation center and was informed that, as the result of lack of attendance, respondent had not been placed in a job.
*108 No contact was made by the mother until April 3, 1973 when she entered Pilliod’s office to announce that she was "tired of planning and talking to social workers”. As of this time, Pilliod’s evaluation was that "Theodora was unable to make a plan for Orlando or placement back with her.” Thereafter, further appointments were missed until July 6, 1973 when Pilliod met with respondent and her friends, the Dennises. It was related that these friends would be willing to care for Orlando on a temporary basis and they agreed to return and discuss possible details. There was no follow-up by them. From July 6, 1973 until September 4, 1973, no communication was forthcoming from respondent because she had "been away”. On September 11, 1973 Pilliod, convinced that no other viable solution could be reached, transferred the case to another caseworker and began completing the paperwork necessary to institute this proceeding to terminate Theodora’s parental rights.
Dr. Ronald, a psychologist specializing in the area of mental retardation, testified on behalf of respondent. She related that she had known respondent since January or February of 1974, had observed respondent’s second illegitimate child as being bright, attractive and properly cared for, and had concluded that respondent was physically and financially able to care for a child. She further opined that people reared in an institutionalized setting require "much more concrete structure and plan action” to deal with daily tasks than others, because of a lack of experience.
At the conclusion of the fact-finding hearing the Family Court Judge dismissed the petition. He found that the natural mother had evinced a "burning desire” to obtain custody of her child and that petitioner had failed to prove affirmative neglect. Orlando was directed to be returned to his natural mother. The Appellate Division modified by deleting that portion of the order which directed Orlando’s return because, in their view, "it has not yet been shown that the parent is in a position to care for the child”. The dismissal of the petition seeking to terminate parental custody was affirmed on the ground that the period of time in which respondent had failed to maintain contact with the child was only eight months, not the one-year limitation required by statute (Family Ct Act, §§ 611, 614). Justice Kupferman dissented in part. In his view, the evidence demonstrated that respondent mother had failed to plan for the future of her child and that, "[i]nasmuch as it *109 is the best interest of the child with which we are concerned”, the parental right should be terminated. We agree.
Section 611 of the Family Court Act,[1] in defining a permanently neglected child, at the time of the institution of the proceeding, provided: "A 'permanently neglected child’ is a person under eighteen years of age who has been placed in the care of an authorized agency, either in an institution or in a foster home, and whose parent or custodian has failed for a period of more than one year following the placement or commitment of such child in the care of an authorized agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and ñnancially able to do so, notwithstanding the agency’s diligent efforts to encourage and strengthen the parental relationship when such efforts will not be detrimental to the moral and temporal welfare of the child. In the event that the parent defaults after due notice of a proceeding to determine such neglect, such physical and financial ability of such parent may be presumed by the court.” (Emphasis added.) It was necessary that these definitional elements be alleged in the petition, in addition to an assertion that "the moral and temporal interests of the child require that the parents’ or other custodian’s custody of the child be terminated permanently” (Family Ct Act, § 614, subd 1, par [e]; see L 1973, ch 870).[2] Both the Family Court and the Appellate Division were in agreement that the significant element left unproven by petitioner was that respondent had failed for a period of one year to substantially and continuously maintain contact with or plan for the future of the child. A reading of the respective opinions here, however, reveals that the phrase "maintain contact with or plan for” was interpreted as comprising only one requirement, that is, it was read in the conjunctive rather *110 than the disjunctive. For example, the Appellate Division, referring to the fact that respondent communicated with petitioner in September of 1973 and suit was brought in May of 1974, concluded that "The period of lack of contact here was only eight months” (emphasis added). This was incorrect. The history of the statute (Family Ct Act, § 611) demonstrates that by amendment in 1973 the words "and plan” were substituted by the words "or plan”, thereby making it abundantly clear that separate requirements were intended (L 1973, ch 870, § 2). This distinction has been delineated and applied in other decisions (see Matter of Ray A. M., 37 NY2d 619; Matter of "Female" B., 49 AD2d 615; Matter of Orzo, 84 Misc 2d 482), so that it has become recognized that a finding of a failure to plan, in and of itself, suffices to support a determination of permanent neglect (see Matter of Barbara P., 71 Misc 2d 965).
To "substantially plan” "means to formulate, and act to accomplish, a feasible and realistic plan” (Matter of Stephen B., 60 Misc 2d 662, 668, affd sub nom. Matter of Behrman, 34 AD2d 527; see, also, Matter of Orzo, supra, p 489).
Assuming, without deciding, that respondent maintained sufficient contact with the child, the question narrows itself to whether petitioner established that respondent failed "substantially and continuously * * * to * * * plan for the future of the child” (Family Ct Act, § 611). We hold, as a matter of law, that petitioner did so prove and, therefore, under the facts of this case, permanent neglect should have been found as to Orlando.[3]
To be sure, the mother has evinced a "burning desire” to regain custody of the child, but it is undisputed that in the three years preceding this litigation she failed to take the affirmative steps necessary to insure that Orlando would be the rightful beneficiary of an adequate home life if returned to her. Missed appointments, promises to secure her own apartment—which never reached fruition, living with various persons and an inability to be placed in a job as a result of *111 nonattendance at the rehabilitation center compels this conclusion.
State Senator Joseph R Pisani, Chairman of the Temporary State Commission on Child Welfare, in support of the aforementioned 1973 amendment, wrote: "[E]ven when there is substantial and continuous visitation, the parent or custodian may fail to take steps to end the foster care status of the child and restore the child to a homelife with the parent or custodian. A child is no less in limbo when kept in foster care year after year when the parent or custodian is physically and financially able to provide a home but fails to do so.” (NY Legis Ann, 1973, p 35.) Such is the case here. The child has remained with the foster parents virtually since birth and they have expressed a desire to adopt. When the natural parent fails to accept the parental role, even though the result of shortcomings for which he or she may not be fully responsible, the "best interests” of the child, the pivotal consideration underlying all of these proceedings, dictates that the right to custody be terminated.
In so deciding, we take heed of the warning that: “ 'Substantial planning’ may appear in this discussion to demand a degree of self-awareness, insight and resolution that most people lack, especially perhaps the mother of a child in long-term foster care. Yet the statute was designed to measure the interests and capabilities of just such a person. Therefore, so that the planning requirement will not become simply a device to permit termination in nearly all cases where the other statutory conditions are met, the standards to evaluate the adequacy of the parent’s plans should not be set unrealistically high. Courts will have to act with sensitivity and care in determining whether the parent’s plans are sufficiently credible and sound to satisfy the statutory requirement.” (Gordon, Terminal Placements of Children and Permanent Termination of Parental Rights: The New York Permanent Neglect Statute, 46 St John’s L Rev 215, 236-237; see, also, Matter of Jones, 59 Misc 2d 69; Matter of Clear, 58 Misc 2d 699.) We need not formulate, under the instant facts, an exact standard which must be met in order to comply with the statutory mandate in light of respondent’s utter failure to exert even a minimal attempt to develop a plan for her child’s future. Indeed, each factual pattern will undoubtedly reveal peculiarities of its own but the particular facts and totality of circumstances must be scrutinized and weighed carefully in *112 rendering decisions in such delicate human affairs (cf. Matter of Klug, 32 AD2d 915).
This issue aside, we turn to another important facet, the appointment of a Law Guardian. Here, a Law Guardian was, in fact, appointed but permitted to withdraw at the commencement of the hearing. This, too, without even a replacement, was an abuse of discretion. Our courts have been sensitive to the expanding rights of children, including the right to be heard (see, e.g., Matter of Cecilia R., 36 NY2d 317; see, also, Matter of Michael C., 50 AD2d 757) and, only recently, the importance of having the child represented by a Law Guardian was emphasized "[s]ince the child cannot obviously speak for herself’ (Matter of Ray A. M., 37 NY2d 619, 624, supra). The usual situation in a permanent neglect proceeding pits the natural parent, with his or her own special interest at stake, against an agency who seeks termination of parental rights so that the child might ultimately be adopted. These parties may well believe that the "best interests” of the child will be served by a "legal victory” on their part. One court recently observed: "Without such representation, the natural parent vigorously focuses on parental rights and claims. The approach centers on whether 'this child belongs to me’, without an equal inquiry, on behalf of the unrepresented infant on whether 'this parent belongs to me’ ” (Matter of Tyease "J.", 83 Misc 2d 1044, 1047). Consequently, although no statute currently so provides, we hold that, in the absence of the most extraordinary of circumstances, at the moment difficult to conceptualize, the Family Court should direct the appointment of a Law Guardian in permanent neglect cases to protect and represent the rights and interests of the child in controversy.
Because of the dismissal of the petition at the conclusion of the fact-finding portion of the hearing, no evidence was taken, pursuant to section 623 of the Family Court Act, on the issue of what disposition order should be made (see, also, Family Ct Act, § 631). Under our holding, the case should be remitted to the Family Court for a "dispositional hearing”, at which a Law Guardian should be appointed to represent the child.
The order of the Appellate Division should be modified, by deleting that portion which affirmed the dismissal of the petition and by ordering that the case be remitted to the Family Court for proceedings not inconsistent with this opin *113 ion and, except, as so modified, the order is affirmed, without costs.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Wachtler and Fuchsberg concur.
Order modified, without costs, and matter remitted to Family Court, New York County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.

. Under section 2 of chapter 704 of the Laws of 1975, eifective August 9, 1975, a provision was added to section 611 of the Family Court Act which reads: "For the purposes of this section, evidence of insubstantial and infrequent contacts by a parent with his or her child shall not, of itself, be sufficient as a matter of law to preclude a determination that such child is a permanently neglected child.” By virtue of section 1 of chapter 700 of the Laws of 1975, eifective 30 days after August 9, 1975, the phrase "is in the care of’ was substituted for "has been placed in the care” and "date such child came into the care” for "placement or commitment of such child in the care.”

. By virtue of chapter 701 of the Laws of 1975, paragraph (e) of subdivision 1 of section 614 of the Family Court Act was amended so as to substitute "best” for "moral and temporal”.

. Because of the recent amendment to section 611, which provides that evidence of insubstantial and infrequent contacts by a parent with his or her child shall not, of itself, be sufficient as a matter of law to preclude a finding of permanent neglect (L 1975, ch 704, § 2, eff Aug. 9, 1975) the same result might today be reached upon a "substantial contact” basis since the case is to be decided on the basis of the law as it exists today (Matter of Ray A. M., 37 NY2d 619, 621, supra).