OPINION OF THE COURT
Bertram R. Gelfand, S.
Upon this application for the adoption of a nonmarital child petitioners have requested the court to dispense with the service of process upon the putative father. It is argued by *473 petitioners that in this matter the putative father has had no substantial contact with the infant so that Caban v Mohammed (441 US 380) does not confer upon him the status of a necessary party to the proceedings upon whom process must be served. The question presented is whether when it is contended that a putative father has had no substantial contact with the infant this may be accepted ex parte as a basis for concluding that Caban v Mohammed (supra) does not mandate such putative father being joined as a necessary party to the proceedings, or must he be made a party so that he may have the opportunity to be heard on the issue of "substantial contract” or "abandonment” before any such issue is determined.
The thrust of petitioners’ position apparently flows from focusing upon the following language in the majority opinion of the United States Supreme Court in Caban v Mohammed (441 US, at p 392, supra): "When the adoption of an older child is sought, the State’s interest in proceeding with adoption cases can be protected by means that do not draw such an inflexible gender-based distinction as that made in § 111. In those cases where the father never has come forward to participate in the rearing of his child, nothing in the Equal Protection Clause precludes the State from withholding from him the privilege of vetoing the adoption of that child. Indeed, under the statute as it now stands the surrogate may proceed in the absence of consent when the parent whose consent otherwise would be required never has come forward or has abandoned the child. See, e.g., In re Orlando F., 40 N.Y.2d 103, 386 N.Y.S.2d 64, 351 N.E.2d 711 (1976). But in cases such as this, where the father has established a substantial relationship with the child and has admitted his paternity, a State should have no difficulty in identifying the father even of children born out of wedlock.” (Emphasis added; footnotes deleted.)
In the instant matter the infant was born on September 29, 1973. She has remained in the custody of her natural mother since birth. Petitioners are the natural mother and her spouse. The mother submits that after a brief acquaintance with the putative father she learned that she was pregnant in January, 1973. She advised him of this fact and he acknowledged paternity in writing, albeit this acknowledgement was preceded by a threat that the immigration authorities would be advised that the putative father was in the United States *474 illegally. He thereafter disappeared, never to be seen again by her or anyone with whom she is acquainted. Petitioner contends that she has absolutely no knowledge whatsoever as to the putative father’s whereabouts. She even doubts whether the name under which she knew him is his true name. The statements in the petition and papers in support thereof indicate that not only did the putative father never have any substantial contacts with the infant, he has had absolutely no contact whatsoever with the infant.
The material submitted sustains the further conclusions that the putative father is a person whose whereabouts cannot be ascertained by reasonable diligence. Thus, if he is entitled to the same notice of the proceeding that a mother would receive if her whereabouts were unknown, process must be served upon the putative father by publication (SCPA 307, subd 2, par [a], cl [iv]).
The arguments that such a necessity is an expensive and sterile act which will achieve no pragmatic goal of importance to anyone are persuasive. Nevertheless, the court is bound to carry out the mandate of existing law. In the absence of a legal basis for the relief sought by petitioners, as practical as it may seem, if its result is a jurisdictional defect, it cannot be allowed.
The court has most carefully examined the law as to the status and rights of putative fathers in proceedings relative to the adoption of their children in a search for an avenue that would facilitate practicality and legality traveling the same road. This has necessitated a review of the relatively radical and rapid evolution that has affected the status of nonmarital fathers in adoptions. The New York statutes clearly and explicitly have long provided that a mother has an absolute right to veto the adoption of her child provided she has not forfeited this right by abandonment, binding surrender, displacement by a guardian appointed pursuant to section 384-b of the Social Services Law, deprivation of civil rights, or mental illness or mental retardation under certain circumstances, whether the child is a marital or nonmarital child. (Domestic Relations Law, § 111.) New York statutes have provided with equal clarity that consent of the father to the adoption of a nonmarital child is not required (see Domestic Relations Law, § 111). He accordingly did not by statute possess the same right to veto an adoption possessed by the mother. The first assault upon this long standing statutory *475 scheme came after the decision of the United States Supreme Court in Stanley v Illinois (405 US 645) whose import initially appeared to be limited to the conclusion that a nonmarital father had the right "to be heard” in a proceeding involving the custody of his children before his rights, if any, were extinguished (see Matter of Malpica-Orsini, 36 NY2d 568; Matter of "Male F.”, 97 Misc 2d 505).
In response to Stanley v Illinois (supra), the 1976 Legislature enacted section 111-a of the Domestic Relations Law to provide that every putative father must receive "notice” of a proceeding for the adoption of his child. This section reflected a deep sensitivity to the biological reality that the identity of nonmarital fathers was not as easily discernible as that of nonmarital mothers. The procedures for serving this notice on nonmarital fathers also reflected a sensitivity to the reality that in the multitude of cases involving totally disinterested putative fathers, their present whereabouts were even more difficult to determine than their identity. The 1977 amendment to section 111-a of the Domestic Relations Law provides that where personal service of the "notice” of adoption could not be completed with "reasonable effort”, notice could be completed by the necessary papers being mailed to the putative father at his "last known address”, even if it was known that his association with this address had long ago terminated or if, with the passage of time, the address had evolved into being an abandoned building or a vacant lot (see Matter of Monique J., NYLJ, March 21, 1979, p 13, col 5). The statute specifically states that publication is not required when the whereabouts of such putative father are unknown (Domestic Relations Law, § 111-a, subd 4). Clearly, under this statutory scheme, in an effort to be practical, the constitutional mandate of notice was being satisfied by a statutorily authorized procedure which, in most cases, was devoid of even the remote possibility of actual notice that flows from service by publication. The challenge of Stanley v Illinois (supra) was thus met by a legislatively sanctioned procedure that in many cases was startlingly akin to "sewer service”.
The next step in the evolution of the status of putative fathers came from the majority opinion in Caban v Mohammed (441 US 380, supra), which quite clearly concluded that in an adoption proceeding any statutory scheme which gives to the mother of a nonmarital child greater rights than to the father similarly situated is constitutionally offensive to the *476 right of equal protection of the law to which every citizen is entitled, regardless of sex. The pragmatic effect of imposing this necessity on the multitude of children of nonmarital origin who are in need of adoption is obviously significantly adverse to the expeditious and economic completion of such adoptions.
Expedition is the hallmark of an effective system of justice. The urgency for expendition in concluding judicial proceedings was succinctly summarized by Chief Judge Cardozo’s admonition in Matter of Raymond v Davis (248 NY 67, 72) that a postponement of justice may be the equivalent of a denial. Chief Judge Cooke in a recent address again emphasized that undue delay in concluding matters was a "shocking” condition which must be remedied (see Cooke Outlines "Giant Effort” To Reduce Civil-Case Backlog, NYLJ, Sept. 26, 1979, p 1, col 3). There are few areas in the administration of justice where the prejudice of delay to the defenseless is greater than where a maturing infant’s total incorporation into a wholesome family unit is delayed in limbo while the issue wends its way through vain proceedings involving the clearly disinterested.
The court is impressed with the folly of publishing a citation in an adoption proceeding addressed to a putative father in cases such as the instant matter, where the essential contact between the biological father and the child terminated at the instant of conception. In the hope of avoiding this folly, the court has painstakingly reviewed case law and the statutes in a search for a possible legal basis by which it could answer the question as to whether there must be publication of a citation to the natural father in this case, in the negative. Such a result would serve to relieve petitioners of the expense of even a single publication. While the cost of such publication may be relatively small in relation to a person’s parental rights, it is a burden on the adoptive process which if possible, should be avoided since concomitant to the expense of publication against a party whose whereabouts are unknown, is delay and the necessity under well-established procedures to appoint a guardian ad litem for this person if he does not appear in the proceeding in response to process (SCPA 403). Eventually, this will involve further financial burden as the number of cases mount, and the court seeking to avail itself of the generous pro bono publico services of the Bar, reaches the point of saturation in obtaining guardians ad litem who waive compensation.
*477 Nevertheless, after this painstaking review it must regrettably be concluded that the position of petitioners cannot be sanctioned. An orderly system of justice basically rests on stare decisis. This involves the acknowledgement by all lower courts of the supremacy of the determinations of appellate courts, and ultimately of the United States Supreme Court relative to constitutional questions. In deference to this responsibility it must be concluded that Caban v Mohammed (441 US 380, supra) provides that the status and rights of a nonmarital father in an adoption proceeding cannot be different than that of a nonmarital mother just because the father is a male and not a female. Since a nonmarital mother whose rights have not been previously extinguished or surrendered would have to be served with appropriate process under New York’s statutes, even though a petition for adoption alleged she abandoned the child, a nonmarital father also must be served with such process. Since here such father is a party whose whereabouts are unknown, the only feasible applicable means of serving this process is by publication (SCPA 307, subd 2, par [a], cl [iv]).
It must be noted that this wasteful impediment on the conclusion of the adoption process to the prejudice of children in need of adoption being incorporated into permanent family units is a socially unacceptable circumstance that cries out for the commencement of a quest for a better way. This procedure relative to putative fathers which case law has implanted on New York’s statutory adoption scheme in application will rarely involve an interested parent such as Mr. Stanley or Mr. Caban, but rather will be a vain effort to reach out for a multitude of biological fathers who never had, do not have, nor will likely ever have, a scintilla of interest in the child at issue. It is even more absurd where this effort involves service of process on a putative father who is. no more identifiable than a fictitious "John Doe” and where the child’s conception was under such circumstances so that even the child’s mother must speculate as to the identity of the actual father. In many of these "John Doe” cases only the Almighty knows the identity of the real biological father and even if a respondent came forward he could not possibly establish his parental status.
This situation presents a substantial and urgent challenge to the Legislature. If it is to be remedied by a constitutionally acceptable procedure, our statutes must be amended to meet *478 the mandate of treating mothers and fathers equally while still endeavoring to avoid burdening the adoption process with the futility of joining totally disinterested parents. Distinctions based on sex must be abandoned. The goal must be to distinguish between the parentally interested Stanleys and Cabans, and the fleeting disinterested impregnators who are not available when the mother is executing her surrender of the child or consent to adoption. To achieve this goal the definition of who is a necessary party to an adoption is worthy of further evaluation. A practical and constitutional result which would appear to be equitable to all those interested in a child, and the child, appears to be to limit the definition of necessary parties to a nonmarital parent who personally added his name to the child’s birth certificate, acknowledged parenthood in a judicial proceeding, was adjudicated as a parent, or who has registered with the putative father registry now established within a reasonable period to be fixed by statute, after the birth of the child or if the information submitted by petitioner suggests that the parent has supported the child or exercised parental responsibility within six months of the filing of the application. This standard can thus be applied to both nonmarital parents without any distinctions based solely upon sex. It would obviate both as to mothers and fathers their joinder in the proceeding unless they have affirmatively availed themselves of the privilege of acknowledging their parental relationship to the infant. It is difficult to conceive that limiting this procedure to nonmarital parents would create a constitutionally offensive distinction between nonmarital parents and parents of children born in wedlock. Clearly, those who have children in wedlock have by their marriage prima facie established their parental status by an affirmative course of conduct not present in nonmarital situations, to wit, matrimony.
As the law now stands, the application in this matter to dispense with publication must be denied and the petitioners must serve an appropriate citation on the respondent putative father by publication one time in the New York Law Journal.