OPINION OF THE COURT
Nanette Dembitz, J.
The issue in this proceeding is whether the court can and should grant the right of visitation to former foster parents, who had given their foster child excellent care for virtually all of her first four and one-half years of life, after her return to her natural father and stepmother. At the time of the child *408 Melissa M.’s return to Mr. and Mrs. M. nine months ago under this court’s order, pursuant to section 392 of the Social Services Law, they requested a delay in consideration of visitation until they had had time to promote Melissa’s adjustment to them as her custodial parents; former foster parents Mr. and Mrs. L. have now renewed their motion for visitation. The question it presents as to a child’s attachments and detachments appears to be one of first impression in the controversial foster care area.
The facts that underlie the motion are, in brief, that Melissa, now 5 years old, was placed in foster care by her father when she was 8 months, together with her older brother. At that time her mother, who had separated from her father, was hospitalized for mental illness, as she had been several times before; the children had been going from relative to relative, none of whom could afford them stable care; the father, who had been a heroin addict, wanted to reconstruct his own life— to finish his vocational training and secure employment— before establishing a home for the children. For more than a year before this court’s trial to determine whether Melissa should remain in the L.s’ foster care, Mr. M., having achieved his goals and remarried, had been asking for her return. The foster care agency opposed her return because its consulting psychiatrist advised, as he testified at the hearing, that the L.s’ love and guidance of Melissa was so valuable and her attachment to them had so intensified over the four and a half years of their foster care that her separation from them would have "disastrous” psychological consequences for her; a psychiatrist of the court’s Mental Health Services concurred in this opinion, adding that adoption by the L.s’, which they greatly desired, would be in her best interests if legally possible, because they had become her "psychological parents.”
Discounting these expert opinions on the basis of the facts established adversarially at the trial (see Matter of Bennett v Jeffreys, 40 NY2d 543, 549; People v Lancaster, 65 AD2d 761; Matter of City of New York, 1 NY2d 428, 432), this court rejected the psychiatrists’ recommendation that Melissa should remain with her foster parents. Nevertheless, their careful, conscientious, and consistent evaluations as to Melissa’s need for a relationship with her former foster parents, adds to the gravity of the instant motion for visitation.
*409 JURISDICTION TO ORDER VISITATION
The argument advanced by the Department of Social Services that this court lacks jurisdiction to grant the motion for visitation must be rejected. It is true that the foster care review statute (Social Services Law, § 392) makes no mention of visitation and that this court is a "statutory court” of limited jurisdiction (Matter of Anonymous v People, 20 AD2d 395, 401, affd sub nom. Matter of Fish v Horn, 14 NY2d 905; Clune v Clune, 57 AD2d 256; Matter of Borkowski v Borkowski, 38 AD2d 752, 753). Nevertheless, it has the powers reasonably implied by the governing law, which in this court’s opinion include the authority here in issue, for the following reasons.
The foster care review statute explicitly grants this court extensive control of custody in foster care cases; indeed, such control was the enactment’s major purpose. Though the Appellate Division in one instance under a cognate statute disapproved the Family Court’s implication of the power to order visitation (Matter of Suzanne N. Y., 66 AD2d 723, 724), " 'visitation’ has oft been described as a form of 'quasi’ or 'limited’ custody * * * it appears only proper that we construe the 'greater’ term (custody) as encompassing the 'lesser’ term (visitation)” (Juan R. v Necta V., 55 AD2d 33, 35). In accordance with this general rule, subdivision (b) of section 651 of the Family Court Act was interpreted in Juan R. as a grant of power over visitation though the section only mentions custody. (See, also, Matter of Fernberg v Fernberg, 48 AD2d 761; Matter of Hood v Munroe, 62 AD2d 1058.)
In view of the relationship described in Juan R. between visitation and custody, it seems clear that this court can condition a custody order under section 392 of the" Social Services Law on a visitation requirement. For the court is granted broad discretion regarding supplementary orders by the provision that: "The court may make an order of protection in assistance or as a condition of any other order made under this section. The order of protection may set forth reasonable conditions of behavior to be observed for a specified time by a person or agency who is before the court.” (Social Services Law, § 392, subd 8.)
Finally, in arguing against the court’s jurisdiction to grant the motion, it is suggested that even if visitation for former foster parents could be ordered regarding a child still in foster care, such authority terminates when the child has been, like *410 Melissa, discharged to the biological parent. However, the section providing for foster care review provides: "The court shall possess continuing jurisdiction in proceedings under this section and, in the case of children who are continued in foster care, shall rehear the matter” (under certain circumstances). (Social Services Law, § 392, subd 10.) In view of the specific limitation in the second clause to "children in foster care,” the first clause must be interpreted to include children who are no longer in foster care. (See McKinney’s Cons Laws of NY, Book 1, Statutes, §§ 98, 114, 231, 238; Schieffelin v Craig, 183 App Div 515, 522.)
In sum, the power to order visitation for former foster parents can, in this court’s opinion, be validly implied for a reasonable period after the child has left the foster parents’ home. In the exercise of this power, the child’s best interests must be deemed the criterion for the issuance of orders; that standard pervades foster care review, with the Legislature elevating it to unusual predominance. For best interest is the sole determinant under the statute of whether a child should remain in foster care (Social Services Law, § 392, subd 7), in contradiction to the common-law doctrine that the best interest standard only applies between parents and that a parent unless unfit has a superior right to the child over a nonparent. (See People ex rel. Kropp v Shepsky, 305 NY 465, 468-469; see, also, Social Services Law, § 384-a, subd 2, par [a].)
The power to order visitation for former foster parents in the service of a child’s best interests even after his discharge to his natural parents, seems constitutional despite the high status of the parent’s right to control the upbringing of his child (see Stanley v Illinois, 405 US 645, 651). The court’s powers in foster care review proceedings are triggered by the child’s placement in foster care for at least 18 months; thus, due to the parent’s actions the child has suffered the emotional burden of extended suspension between natural parents and foster parents as well as separation when parental custody is resumed from those who have been performing a lengthy continuous parental role. Whatever may have been the reason for the parent’s placement of the child, upon his return it seems justifiable to realign for a reasonable period the balance between the parent’s right to control his child’s upbringing and the State’s function as parens patriae to protect the child’s best interests. See Matter of Bennett v Jeffreys (40 NY2d 543, 546): "[I]n the extraordinary circum *411 stance * * * the best interest of the child has always been regarded as superior to the right of parental custody * * * A child has rights too, some of which are of a constitutional magnitude.”
child’s best interests regarding visitation
To determine Melissa’s best interests in regard to visitation, the reasons for the court’s ordering her return to her father and stepmother must first be summarized (the natural mother is not making any claim for custody or visitation).
This court (without written opinion) rejected the psychiatrists’ recommendation that Melsissa should remain with her foster parents, primarily because the evidence at the lengthy trial proved conduct unknown to the psychiatrists of amazing strength by Mr. M. in recent years and by his present wife in relation to his children; the court was convinced that their present constructive way of life will survive through the children’s minority. Mr. M., who had been a fatherless youth, a school truant and drop-out, and a heroin addict, graduated from a drug-free drug rehabilitation facility after two years of voluntary residence; he has remained entirely drug free for the past three years (at the least), holding steady garage employment during that period, taking courses to upgrade his skills, and repairing cars in his off hours to augment his income. In August, 1977 his son Peter, Jr., then age seven, returned to him and his present wife at his request from the L.s, where the boy was unhappy and difficult (in contrast to Melissa), encopretic as well as eneuretic, unwilling to attend school, disruptive and learning-retarded. According to the testimony of the principal of the public school he now attends, his improvement during his residence with his father and stepmother was "remarkable.” Among their attentions to him, the stepmother escorted him to and from school twice daily for an entire school year and regularly attended parent workshops and frequent school conferences. Mrs. M. had foregone, and testified that she intended to forego, reproduction until both of the M. children were returned to Mr. M. and well adjusted.
In recommending Melissa’s continued foster care the psychiatrists mentioned her sobs and screams when she left her foster parents for overnight visits at the M.s; yet the proof was convincing that her relationship with the latter became affectionate and well adjusted after the crisis of departure. *412 The agency’s consulting psychiatrist had no suggestion as to how this transitional tension could be alleviated. Thus, prolongation of Melissa’s foster care would have meant prolongation of her anxiety.[1] Finally, the court was convinced by the M.s’ commitment and patience in their handling of Peter, that any trauma she would suffer through separation from the L.s would probably be overcome in a short time, despite her firm articulation to the psychiatrists of her desire to remain with her foster parents.
In part because of the psychiatric opinions as to the strength of her bond with the L.s, this court’s order discharging Melissa to her father and stepmother directed special reports by the Bureau of Child Welfare on her adjustment in the M.s’ home and on the desirability of visitation by the L.s. The reports show that Melissa initiated telephone calls to the L.s during her first weeks at home; but that she thereafter only spoke of them if asked, and that she and her brother are now "outgoing and friendly * * * relaxed, well behaved, respectful and affectionate towards their parents. Mr. and Mrs. M * * * have provided a well balanced atmosphere of love and direction * * * the children appear to be flourishing.”
Despite Melissa’s good adjustment, there is merit to the L.s’ prayer for visitation in that it could be psychologically beneficial in contrast to their abrupt and complete disappearance from her life and in that the L.s could perform a helpful role as an extended family in view of the dearth of interested blood relatives.[2] Mr. and Mrs. M., however, while recognizing the L.s’ "unquestionable” love for Melissa, oppose visitation on the ground that it would disrupt their family life, causing confusion and instability for her as well as possible regression for Peter.
Since the parents’ view is reasonable, determination of the visitation motion comes down to the question of whether the court can substitute its judgment of Melissa’s best interests for theirs. While the State can modify and even abrogate the parent’s right to raise his child under exigent circumstances (see Prince v Massachusetts, 321 US 158, 165-167; Matter of Orlando F., 40 NY2d 103), nevertheless, the parental decision- *413 making prerogative with "freedom of personal choice in matters of * * * family life” should be maintained or restored unless there is strong reason for interference with it. (See Quilloin v Walcott, 434 US 246, 255; see, also, Smith v Organization of Foster Families, 431 US 816, 842-843; Wisconsin v Yoder, 406 US 205.) Here State intervention would be unjustified because the parents have shown themselves entirely adequate to judge Melissa’s needs as an individual and as a family member. While the L.s’ heartbreak at their complete severance from Melissa is poignant as well as its seeming unfairness in view of their responsibility for her early excellent development, their motion for visitation is denied.

. Avoidance of this psychological dilemma through complete termination of Mr. M.’s parental rights and adoption by the L.s, as suggested by one psychiatrist, seemed contrary to Melissa’s best interests and was in any event legally unfeasible.

. The L.s are well situated financially compared to the M.s, and Mrs. L. has childcare training through her work as a special education and Montessori teacher.