■ In the Matter of SEAN X. MARY J. BRENNAN, as Director of Services to Children of the Nassau County Department of Social Services, Respondent; IRMA Y., Appellant. — In a proceeding pursuant to article 6 of the Family Court Act, to adjudicate Sean X. a permanently neglected child, and to commit him pursuant to section 384-b of the Social Services Law to the custody and guardianship of the Commissioner of the Nassau County Department of Social Services (DSS), the natural mother, Irma Y., appeals from an order of disposition of the Family Court, Nassau County (Collins, J.), entered September 16, 1983, which directed, pursuant to subdivision (c) of section 631 of the Family

Court Act, that the guardianship and custody of Sean X. be committed to the Commissioner of the DSS on condition that the child be adopted by Stephan and Eleanor Z.

Order affirmed, without costs or disbursements.

The subject of this proceeding is Sean X., born August 30, 1970. Sean has a brother, Gene X., born December 4, 1967, a sister, Jodi X., born September 20, 1971, a stepbrother, Wesley, born May 30, 1974, and a stepsister, Estelle, born June 26, 1975. Sean's mother is Irma X., who, after being divorced from Sean's father, remarried and became known as Irma Y. (the appellant).

The affidavit of Ada Nemirow of November 24, 1982 in support of the permanent neglect petition instituting this proceeding, states that in January, 1976, Irma Y. left Sean and his siblings with their father, departed for Florida, and left no forwarding address. The father, unable to cope with the children, deposited them with the police.

During the same month, January, 1976, petitions alleging neglect were filed by the DSS against Sean's mother, Irma Y., on behalf of the five children.

The neglect petition of 1976 filed on behalf of Sean charged, *inter alia,* that he was subjected to heated verbal arguments between his natural parents, that he had been struck with a belt and pounded against the wall by his stepfather, that his parents could not control Sean's temper, and that Irma Y. left the State without a formal plan for the children's supervision.

All of the children were found to be neglected, as defined by section 1012 of the Family Court Act, and, on September 9, 1976, all were placed in custody of the DSS.

By 1981, all the children except Sean had been returned to Irma Y., who was again residing in New York.

From 1976, when he was less than six years old, Sean lived in foster homes. In 1978, due to behavorial problems, he was placed in residence at St. Christopher's Home in Sea Cliff. Coincidentally, his brother, Gene was also in residence at St. Christopher's. While at the home, the "Z" family became interested in Sean, and on June 22, 1979, he was placed with the Z family, where he resides to date. These foster parents want to adopt Sean.

Since 1979, placement of Sean with the "Z" family was extended annually on consent of the appellant.

Revelations of suicidal tendencies and the deterioration and regressive condition of Sean were raised, thereby causing accelerated procedures regarding Sean's placement. On November 26, 1982, the DSS filed the petition instituting the present

proceeding to adjudicate Sean a permanently neglected child and to commit the guardianship and custody of Sean to the Commissioner of the DSS pursuant to section 384-b of the Social Services Law. On Friday, December 3, 1982, the petition was served upon Mrs. Y., and a trial was scheduled for Thursday, December 9, 1982.

It is to be noted that section 617 of the Family Court Act provides: "(a) Service of a summons and petition under this part shall be made by delivery of a true copy thereof to the person summoned at least *twenty days* before the time stated therein for appearance. If so requested by the parent or other person legally responsible for the child's care, the court may extend the time for appearance and answer" (emphasis supplied).

Notwithstanding the 20-day summons requirement of that statute, insofar as appears from this record, appellant did not engage in any proceeding prior to December 9, 1982 to challenge the jurisdiction of the Family Court.

At the inception of the hearings on December 9, 1982, appellant's counsel (Nassau/Suffolk Law Services) — which had represented her in the annual extension proceedings since 1979 — did not challenge the jurisdiction of the court but simply asked for an adjournment, claiming that appellant had tried to prepare but did not have adequate time to do so. The 20-day summons requirement was finally mentioned by appellant's counsel, at the *conclusion* of this application, but only in the context of an application for adjournment. No mention was made of jurisdiction.

The court responded that although the permanent neglect petition was of recent date, the extension of placement "had been on for awhile". The court stated that it had received reports from ministers, doctors and the DDS, and that based on the "alarming information" about Sean's suicidal tendencies, an urgency for proceeding with this matter was indicated. The court noted that the County Attorney would move forward first, and that appellant could listen to the testimony and then have sufficient time to put together a defense. Appellant's counsel excepted and stated his position that he would not participate in the hearing, and, if the court proceeded, Mrs. Y. would stand mute.

The critical nature of the situation with which the court was confronted was clearly indicated by the testimony of Dr. Jerome Fass, chief of child and adolescent psychiatry at Queens Hospital Center. Dr. Fass testified that he first interviewed Sean in May, 1980, and at that time found Sean to be suffering from depression and an adjustment disorder, secondary to the trauma

that he had encountered over a span of time. Sean had a great many fears, the most glaring of which was that he would have to return and live with his biological mother — and referred to her by her new marriage name — never mother. Sean said that his brother, Gene, homosexually attacked him when they were both at St. Christopher's and again when they were both in a foster home prior to Sean going to the Z family. Sean related that he was often hit by his older brother and was also hit by his mother.

Other manifestations as a result of Sean's depression included bed wetting, rashes, stomach problems and inability to sleep. The depression also caused difficulty in his school work. Sean feared that he would perish and literally die if he had to return to his mother.

On October 26, 1982, Sean's depression had become more intense. Fearing that officialdom would return him to his mother, he said he would kill himself if that occurred. He informed the doctor that certain statements made by his mother caused him to fear that a policeman would come and remove him bodily and that his mother would kill him and Mr. and Mrs. Z. because he had expressed his desire to be with them instead of his mother.

As a result of the October 26 interview, Dr. Fass found Sean to be much more depressed and that he was suicidal. Sean "actively spoke about killing himself". Dr. Fass attached a great deal of significance to these statements because "[o]n October 18 [Sean] put a noose around his neck and he said he would try to kill himself" if he was forced to return to his natural mother.

The relationship with the Z family was the only positive thing he had ever experienced in his life. Dr. Fass was of the opinion that if the court did not terminate the parental rights of Sean's mother: "[Y]ou will not have to have another court hearing. I don't think you are going to have a child".

Throughout Dr. Fass' testimony, the mother and her counsel stood mute. At the conclusion of Dr. Fass' testimony, in response to the court's invitation, counsel for Sean's mother advised the court that he did not wish to ask any questions.

Sean's mother and her counsel similarly stood mute throughout the ensuing testimony. This testimony included the following:

(1) Assertions by Sean's fifth grade teacher that Sean's academic work and behavior had deteriorated.

(2) Testimony by Rita Corwin, a psychiatric social worker to whom Sean said he wanted to kill himself because of the threat that he might be returned to his mother; and further, that he

claimed his mother had threatened to kill Mrs. Z. if he continued to talk about things that went on in the mother's home. Sean was very frightened of men and told her he had been beaten by his mother's boyfriends. Mrs. Corwin concluded that returning Sean to his mother would be disastrous.

(3) Testimony by a priest at the church that Sean attended with the Z's that Sean told him he would kill himself if he had to return to his natural mother.

(4) Testimony by DSS foster case worker Shannon Craig that Sean told her that he had been beaten up and sexually attacked by his brother Gene, and that on September 28, 1982, Sean said he felt the next court date was a deadline and that he would rather be dead than go home. In October, Sean told Shannon Craig that on a school bus trip, he heard another child mention Family Court; the very mention of that court so frightened Sean that he put a noose around his neck and tightened it. The noose was made out of fishing line that he had for the trip.

(5) Sean's in-chambers testimony, which included his assertion that Gene committed homosexual attacks on him and always punched him around and that Mrs. Y. was there watching, but did not care, and did nothing to stop it.

After three days of hearings, the permanent neglect proceeding was completed on December 13, 1982. On April 6, 1983, the court rendered a decision on the fact-finding hearing and granted the petition for commitment and guardianship and custody pursuant to section 384-b of the Social Services Law.

On her appeal from the order of disposition, Sean's mother advances four legal points, viz.: (1) service in this proceeding was not effected upon her in compliance with section 617 of the Family Court Act, i.e., failure to serve the summons 20 days in advance of the hearing, thereby depriving the Family Court of both subject matter and in personam jurisdiction; (2) the court refused to grant her an adjournment to prepare for trial and its insistence on proceeding on only six days' notice deprived her of due process and the effective assistance of counsel; (3) the court did not use the proper legal standard in its decision granting the petition, i.e., it applied to the *fact-finding* determination a standard appropriate to the *dispositional* hearing, viz., the best interest of the child; and (4) respondent failed to establish by clear and convincing proof that Sean was a permanently neglected child.

In reviewing the arguments made on appeal, we find no basis for disturbing the order under review.

Appellant's third and fourth points are clearly without merit because the record indicates by clear and convincing evidence (*Santosky v Kramer,* 455 US 745) that she failed to meet the planning requirement of section 384-b of the Social Services Law, and that Sean is a permanently neglected child within the meaning of paragraph (a) of subdivision 7 of that section (see, also, Family Ct Act, § 611; *Matter of Orlando F.,* 40 NY2d 103).

We have considered the circumstances under which this petition has been brought and find that the "best interests" of the child will be served by granting the petition (*Matter of Bennett v Jeffreys,* 40 NY2d 543).

Similarly, we find no merit to appellant's first and second points pertaining to jurisdiction and appellant's request for an adjournment. Those contentions, however, warrant some further review of the record and some comment.

We note that prior to the testimony of the first witness, counsel for appellant asked for an *adjournment* for time to prepare. The court offered counsel whatever time he needed to prepare the case so long as the case could move ahead with the County Attorney moving forward first. However, counsel declined to avail himself of the offer. After each of the witnesses testified, the attorney stated for the record that "[w]e decline to participate for the same reason stated earlier".

The Court responded, *inter alia,* that:

"It's true that the case is moving forward briskly, because we have a child doctor who has said it over and over that this is an emergency situation. He is deteriorating before the eyes of everyone, school, foster parents, and every expert doctor. And I will not be a part to continuing the deterioration.

"So, we're ready to proceed".

After seven witnesses testified, the attorney for the appellant raised the question of whether the court had subject matter jurisdiction to hear the case. The court instructed him to make his motion on papers and continued the hearing.

Upon returning for the afternoon session, the court noted that appellant had served a written motion at 2:30 P.M. and that it would reserve decision on the motion.

The written motion, dated December 10, 1982, was "for an order pursuant to CPLR § 3211 a (2) & (8) [*sic*], and Family Court Act § 617 dismissing the petition herein on the grounds that this Court does not have requisite jurisdiction over this proceeding". The moving affirmation states that "[i]nasmuch as * * * Irma [Y.] was never served with a summons and was not given the requisite twenty-day period in which to appear, this Court does not have requisite jurisdiction over this matter".

Of particular significance to the resolution of the jurisdiction and adjournment issues raised by Sean's mother is the ensuing comment at the trial by the appellant's counsel, i.e.: "MR. ABROSO: Your Honor, I can only say we have consented to the extension of placement. And we were not asking for a year's delay in the trial. *We were asking for a mere, a few days*. That was denied. And I do not feel there's a basis for that, your Honor" (emphasis supplied).

The court noted that the short notice contention raised by counsel for the mother should be weighed against "a life that could be terminated" and offered to subpoena any witness "to come back" if the mother's attorney wanted to cross-examine anybody. The court added that commencing this proceeding and taking testimony had afforded Sean the security of knowing that the legal proceedings and the uncertainty generated by them, are going to come to an end. It was also noted on the record that the Trial Judge had been on this case since 1976.

On Monday, December 13, 1982, the fact-finding hearing continued with testimony from Rhona Lanzkowski, a psychiatric social worker. Petitioner then rested. At this juncture, there was further colloquy, in the course of which the court renewed its offer to permit appellant to cross-examine any witness who had testified, to offer her own testimony, and to call other witnesses in her behalf. The court also specifically offered appellant's counsel the opportunity to peruse the four-volume DSS case history "to your heart's content" and to cross-examine and recall anyone he wished. Appellant's counsel, however, adhered to his prior position, and declined to participate.

In our opinion, this evidence clearly shows that the court had jurisdiction over the subject matter and the person of appellant. In any case, appellant waived any jurisdictional objections and the court did not abuse its discretion with respect to the issue of whether an adjournment should be granted.

First, the court clearly had jurisdiction of the subject matter of the petition (NY Const, art VI, § 13; Family Ct Act, § 115). Section 115 (subd [a], par [iv]) states that the Family Court has exclusive jurisdiction over proceedings to permanently terminate custody of a child by reason of permanent neglect, as set forth in part 1 of article 6 of the Family Court Act.

Second, the court had in personam jurisdiction over appellant. She was already before the court and represented by counsel when the permanent neglect petition was served. Section 611 of the Family Court Act provides, in pertinent part:

"§ 611. Permanently neglected child; purpose of part

"The purpose of this part is to provide the procedures for proceedings initiated in family court, pursuant to section three hundred eighty-four-b of the social services law, for the commitment of the guardianship and custody of a child upon the ground that the child is a permanently neglected child".

Section 614 of the Family Court Act provides that article 6 proceedings are originated by a petition containing allegations specified in that section. Section 616 of the Family Court Act states that, "[o]n the filing of a petition under this part, the court may cause a copy of the petition and a summons to be issued, requiring the parent to show cause". As has been noted, section 617 of the Family Court Act provides for at least 20 days prior notice.

At bar, it is manifest that the requirement of "at least twenty days before the time stated therein for appearance" (Family Ct Act, § 617, subd [a]), is utterly and totally unresponsive to the exigency faced by the court, viz., objective, impartial evidence that the child as to whom the court has a *parens patriae* interest was threatening to kill himself because of fear of being returned to his home, a fear which was being fed and inflamed by the uncertainty generated by the continual extensions of placement, and the mother having failed to properly plan for the child's future. At the time of the December, 1982 hearing, Sean had already spent half of his short life in placement in foster homes, and the mother expressed to the court that *again* she consented to an additional extension of placement. Sean was first placed in a foster home at age six. He was twelve and one-half years old at the time of the hearing.

In view of the evidence that the child might have died before a return date of "at least 20 days" and any subsequent extensions of time for appearance and answer requested by the mother, it is manifest that — under the circumstances of the case — the court might well have been derelict in its duty if it had relied upon the time frame of that statute, as appellant's counsel now argues that it should have done.

In effect, there was no summons statute covering the extraordinary exigency faced by the court, in either the Family Court Act, court rules, or the CPLR (see Family Ct Act, § 165).

Under the circumstances, the issue was one of due process (see *Santosky v Kramer,* 455 US 745, *supra,* relating to the rationale underlying that court's ruling that under New York's Family Court Act, the "clear and convincing evidence standard should be applied to state-initiated proceedings to terminate parental rights"). When the various articles of the Family Court Act are examined, it may be seen that the notice requirement varies

with the exigency involved in the nature of the proceeding. Thus, in juvenile delinquency, PINS, family offense and child protective proceedings, the service of the summons and petition shall be made at least 24 hours before the time stated for appearance (Family Ct Act, § 312.1, subd 2; §§ 737, 826, 1036). In support and paternity proceedings, the notice period is at least eight days (Family Ct Act, §§ 427, 525).

In *Santosky* (*supra*) the four dissenting Judges noted the materiality of the exigency factor. Thus, the dissent states (455 US 745, 777, *supra*):

"Parents subjected to temporary removal proceedings are provided extensive procedural protections. A summons and copy of the temporary removal petition must be served upon the parents within two days of issuance by the court, FCA §§ 1035, 1036, and the parents may, at their own request, delay the commencement of the factfinding hearing for three days after service of the summons. FCA § 1048.[6] The factfinding hearing may not commence without a determination by the court that the parents are present at the hearing and have been served with the petition. FCA § 1041.

"6. The relatively short time between notice and commencement of hearing provided by § 1048 undoubtedly reflects the State's desire to protect the child. These proceedings are designated to permit prompt action by the court when the child is threatened with imminent and serious physical, mental, or emotional harm".

At bar, appellant had been represented by counsel since 1976, and by present counsel since 1979. She was already before the court in connection with the proposed extension of placement and was served with the subject petition in court. She was entitled to due process. However, Sean was also entitled to due process. Under the circumstances, the procedures followed, and offers made by the court, clearly comported with due process.

Third, the record clearly indicates that appellant initially sought only a brief *adjournment* and that the court was willing to afford appellant time — but only on condition that the petitioner commence presenting her evidence to allay the child's fears. The record also shows that appellant waived any jurisdictional objections at the outset of the hearing and only raised the issue of jurisdiction after seven witnesses had testified.

Finally, we note appellant's claim that since the trial court took a vacation at Christmas, did not render its fact-finding decision until April 6, 1983 and did not conduct the dispositional hearing until September 15, 1983, the trial court's actions were

inconsistent with the alleged exigency. We find that superficially, these contentions would appear to have some merit, but the facts are otherwise. The trial court itself noted that the main object was to commence this proceeding and allow the evidence to be presented and that this would convey to the suicidal child that, at long last, the period of legal uncertainty might end. That object was accomplished by December 13, 1982.

Of far greater significance, however, is the fact that insofar as it appears from the record on appeal, appellant mother — whose complaint ultimately was that "[w]e were asking for a mere, a few days" — did nothing whatsoever between the close of evidence on December 13, 1982, the fact-finding decision of April 6, 1983 and dispositional hearing of September 15, 1983, to reopen the proceedings to present her case, nor did she present any plan for Sean's future, being content, undoubtedly, to permit the continuation of foster care placement and the child's life to exist in limbo. Thus, nine months passed after that request for a "mere * * * few days".

There appears to have been a complete indifference by the appellant to the plight of her child; rather her counsel chose to do nothing except to place on the record a technical objection that might form the basis for reversal on a later appeal, and which would unnecessarily cause the continuance of the legal uncertainty that led to the suicidal tendencies expressed by the child.

Accordingly, the order under review is affirmed. Niehoff, J. P., Rubin, Boyers and Eiber, JJ., concur.