■ In the Matter of LOUISE WISE SERVICES, Appellant. DEBRA

FEBRA, Also Known as DEBRE FEBRE, Respondent.—Order, Family Court, New York County (Leah Marks, F.C.J.), entered January 9, 1986, which dismissed the petition of appellant Louise Wise Services to terminate the parental rights of the respondent mother, unanimously reversed, on the law, the petition reinstated and granted to the extent of finding permanent neglect and the matter remanded for a dispositional hearing in accordance with the findings herein before another Family Court Judge, without costs.

Appellant Louise Wise Services filed a petition to terminate the parental rights of the putative father, which was granted, and of respondent mother with respect to their daughter, Erica, who has been in appellant's care since her birth. When Erica was born in February 1980 her mother was an unmarried minor and both mother and child were voluntarily placed in the Louise Wise Mother/Babies Residence.

Prior to entering the Louise Wise Residence and throughout her stay there, respondent was repeatedly encouraged to attend school to improve her reading and math skills, which were poor, and to get vocational training so that she would be able to provide a suitable home for her child when they were discharged. While in the residence, respondent was referred to the Office of Vocational Rehabilitation, however, her attendance was erratic because she was depressed and slept most of the day. Thereafter, appellant made arrangements for her to attend school in the afternoon.

The staff at the Louise Wise Residence recognized that respondent needed therapy and she was referred for psychiatric help. Respondent had been in at least two foster homes for most of the first six years of her life. Her mother was physically abusive and, at the age of 16, respondent left home. She managed to live independently for several months until she met Erica's father. However, he offered her no assistance when she became pregnant. Because her relationship with her own mother had been a destructive and abusive one, respondent recreated that relationship with others, including Erica. The staff noted that respondent vacillated between being overly indulgent with the child and overly punitive; she encouraged Erica's negative behavior and then reprimanded the child. Respondent also made inappropriate demands of the child because she thought of Erica as "a small adult". There was concern about abusive behavior by respondent whenever she was unhappy or frustrated.

Respondent also failed to attend to Erica's needs. She frequently remained in bed much of the day, causing Erica to

miss breakfast and to be left unattended. In October 1981, Erica swallowed mercurochrome and had to be treated at Mt. Sinai Hospital. Respondent did not properly administer medication that had been prescribed for Erica and she refused to permit anyone on the staff to do so.

The staff's concerns about respondent's ability to be a good parent to Erica eventually led to a recommendation that Erica remain in placement with the agency and that respondent be discharged. Respondent contacted the Parents Rights Committee but, after consultation with appellant's staff, the Parents Rights representative agreed to the recommendation that respondent and the child be separated. Erica was placed with a foster family by Louise Wise Services on July 16, 1982.

As the time approached for her separation from Erica, respondent became more angry and depressed. Although respondent initially agreed to participate in a residential parent-therapist program she later rejected this recommendation, insisting that she wanted to live independently when she left the residence. While she acknowledged that it would be terribly self-destructive to be alone in the city with a young child and without money or resources, she did not avail herself of the vocational opportunities presented to her. She continued to sleep most of the day and did not attend school. She also refused to see a therapist even after requesting that appointments be made for her.

Because respondent had rejected all of the discharge plans presented to her by the agency, no foster placement was found for her until the day she was separated from the Louise Wise Residence in July 1982. The New York Foundling Group Residence agreed to accept respondent, who was then nearly 20 years of age.

In early February 1983, respondent was informed that New York Foundling wanted to close its residence and that she would have to find an apartment by the end of the month. Respondent did not do so but, nevertheless, was permitted to remain as the sole resident at New York Foundling until her twenty-first birthday on September 9, 1983. Respondent, however, made no plans for housing or employment following her discharge from New York Foundling, despite the fact that she had been given six months' prior notice. According to her testimony at the fact-finding hearing, she left her clothing at New York Foundling on September 9 because she had no place else to leave them, and went to the welfare office. She roamed the streets for two days and then stayed at a friend's house until she received help from welfare.

During the next 18 months respondent was either "roaming

around" or periodically staying with friends and acquaintances, because she had no apartment of her own. Respondent's caseworkers repeatedly stressed the necessity for her to find housing and employment if she were ever to regain custody of Erica.

Although respondent had completed training as a nurse's aide in December 1982, her caseworker discovered in January 1983 that she was not eligible for job placement because the vocational school had not received her public school records. The caseworker arranged for respondent to pick up her transcripts, but respondent overslept and missed the appointment. The caseworker also made telephone calls for her about apartments advertised in the newspaper, but respondent, who did not have a steady job, failed to secure any type of housing. It was often difficult for respondent's caseworkers to contact her about job and shelter opportunities because she did not have a stable address. Even when she was notified about available jobs, and interviews were scheduled, respondent failed to keep the appointments. When she did not maintain contact with the welfare office, her case was closed and she lost her welfare benefits.

In October 1983, a counselor from the Office of Vocational Rehabilitation informed Ms. Gross, respondent's caseworker at Louise Wise Services, that they had not heard from respondent in months but that they had a job for her. However, as respondent had left no telephone number with the agency, she was not informed of the job opening until she telephoned Ms. Gross the next day. Ms. Gross scheduled an interview for her but on November 23, an employee of the Office of Vocational Rehabilitation informed Ms. Gross that respondent had failed to keep the appointment. In January 1984 respondent found a job which paid $150 per week but she was fired in February.

Throughout 1984, respondent's contact with the agency was sporadic and she failed to keep the biweekly visitation schedule set by the Family Court. In August, she called saying that she was working and wanted to see Erica. She then canceled the visit after it had been arranged because, she said, she did not have carfare. When respondent's caseworker saw her in October 1984, she got the impression that respondent was living in the street. Respondent refused to tell the caseworker her address.

Respondent testified at the fact-finding hearing that she had worked on a "regular basis" during 1984 but had earned only $1,000 for the entire year. She claimed that her work as a "live-in" nurse's aide prevented her from keeping scheduled appointments with the agency. She acknowledged that she

took "live-in" jobs during this time because they provided a place for her to live. On her days off, she lived with friends.

In March 1985, respondent, who had tired of this way of life, walked into a church and spoke with the pastor's wife who offered a place for her to live. Respondent was permitted to live, free of charge, in a vacant, one-bedroom apartment, in the pastor's house where she resided at the time of the fact-finding hearing. Although she claimed to be earning $600 per month, she did not contribute anything toward the utility or other bills for the apartment.

At the conclusion of the fact-finding hearing, the Family Court Judge found the evidence "absolutely clear that the agency was diligent" in its efforts to encourage and strengthen the parental relationship. However, the Family Court Judge continued: "I think there are cases in which the agency can successfully be diligent in its efforts and the parent can fail in his or her efforts, and nonetheless, have succeeded in attempting to plan." Despite the fact that Erica had been in the care of an authorized agency for five years before the petition was filed, the court ruled that the relevant period for the statutory determination did not begin until respondent herself was out of foster care or "at least on her way out of foster care".

The Judge concluded that it had taken respondent some time "to determine what constituted a good plan" and that during the relevant period respondent, "in her mind * * * was attempting to get herself in a position to have the child returned to her." This was sufficient, according to the Family Court, to establish that the child was not neglected within the meaning of Social Services Law § 384-b (7) (a).

We reject this determination by the Family Court as contrary to the law and without basis in the facts. Social Services Law § 384-b (7) (c) specifies that the plan called for under paragraph (7) (a): "must be realistic and feasible, and good faith effort shall not, of itself, be determinative. In determining whether a parent has planned for the future of the child, the court may consider the failure of the parent to utilize medical, psychiatric, psychological and other social and rehabilitative services and material resources made available to such parent." Thus, the Family Court's finding that an attempt to plan is sufficient to negate a finding of permanent neglect was erroneous, as a matter of law. (Matter of Orlando F., 40 NY2d 103, 110-111 [1976]; Matter of Jamie Y., 92 AD2d 696 [3d Dept 1983].) The statute clearly requires more than good-faith efforts. (See, Matter of Star Leslie W., 63 NY2d 136, 143 [1984] ["Good faith alone is not enough: the plan must be realistic and feasible"].) Moreover, the substantial evidence herein of respondent's repeated failure to make use of the

many opportunities presented to her by the agency or even to maintain her welfare benefits raises substantial questions as to the bona fides of her attempts to utilize the available resources which would enable her to provide an adequate and stable home for the child.

We need not reach the question of whether the relevant statutory period commenced only after respondent had left foster care. Given the record herein, it is clear that respondent failed to plan for the child during the 20-month period after she was discharged from the New York Foundling Residence until the petition was filed in May 1985. At no time during this period did respondent ever secure an apartment of her own. The fact that her pastor permitted her to occupy an apartment in his home, for which she did not pay rent or contribute to the utility bills, cannot be seen as satisfying the statutory requirement of providing "an adequate, stable home". Essentially, respondent was living on the charity of others, without any legal right to occupy the premises, and was subject to eviction at any time.

The record herein conclusively establishes that Erica who is now seven years old and has spent her entire life in foster care, has been permanently neglected. We therefore reverse the fact-finding determination of the court below, reinstate the petition and remand for a dispositional hearing before another Family Court Judge. Concur—Sullivan, J. P., Carro, Milonas, Rosenberger and Ellerin, JJ.